EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Qume Caribe, Inc.<br>　　Apelado-Recurrido<br><br>　　　　v.<br><br>Secretario de Hacienda, Estado Libre<br>Asociado de P.R.<br>　　Apelante-Peticionario | Certiorari<br><br>2001 TSPR 38 |
| --- | --- |

Número del Caso: CC-1997-293

Fecha: 30/marzo/2001

Tribunal de Circuito de Apelaciones:

　　　　　　　　Circuito Regional I

Juez Ponente:

　　　　　　　　Hon. Héctor Urgell Cuebas

Oficina del Procurador General:

　　　　　　　　Lcdo. Sigfredo Rodríguez Isaac
　　　　　　　　Procurador General Auxiliar

Abogadas de la Parte Recurrida:

　　　　　　　　Lcda. Luz Ivette Rivera

Materia: Deficiencia Contributiva

　　Este documento constituye un documento oficial del Tribunal Supremo que está
sujeto a los cambios y correcciones del proceso de compilación y publicación
oficial de las decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Qume Caribe, Inc.

    Apelado-Recurrido

      v.                                  CC-1997-293

Secretario de Hacienda,
Estado Libre Asociado de P.R.

    Apelante-Peticionario

Opinión del Tribunal emitida por la Juez Asociada señora Naveira de Rodón

San Juan, Puerto Rico, a 30 de marzo de 2001

    El Secretario de Hacienda del Estado Libre Asociado de Puerto Rico (en adelante Secretario) recurre ante nos mediante recurso de certiorari de una sentencia dictada por el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan, (en adelante Tribunal de Circuito) en la cual se determinó que el por ciento de Ingreso de Fomento Industrial[1] (en adelante IFI) tributable de una corporación exenta bajo las disposiciones de la Ley de Incentivos Industriales de 1963 se considera parte del ingreso bruto total de operaciones de dicha corporación.[2] Por lo tanto, se pueden compensar ("off set") a ese por ciento tributable del IFI las pérdidas que haya tenido la corporación que provengan de operaciones no cubiertas por la exención provista en la Ley de Incentivos Industriales de Puerto Rico, Ley Núm. 57 de 13 de junio de 1963, según enmendada, 13 L.P.R.A. sec. 10012 a 10023 (en adelante Ley de Incentivos Industriales)

I

    Los hechos del caso no están en controversia, fueron estipulados por las partes. Qume Caribe, Inc. (en adelante Qume) era una corporación organizada en Delaware y autorizada a hacer negocios en Puerto Rico. Se dedicaba a la manufactura de artículos para impresoras, tales como cintas de maquinillas, equipo electrónico para computadoras e impresoras y otros. No se dedicaba a ningún otro negocio. La operación de Qume estaba cubierta por la Ley de Incentivos Industriales. Por virtud de dicha ley, el 90% del total del IFI de Qume era exento de tributación. El restante 10% era ingreso tributable.

---

[1] La sección 10013 de la Ley de Incentivos Industriales de Puerto Rico, Ley Núm. 57 de 13 de junio de 1963, según enmendada, 13 L.P.R.A. sec. 10013 *et seq*, define Ingreso de Fomento Industrial como "[e]l ingreso derivado de la producción de un producto manufacturado que motiva la exención."

Qume tenía tres facilidades manufactureras, dos en Las Piedras y una en Humacao. En 1985, debido a la competencia de Japón, Qume tuvo que llevar a cabo una reorganización que resultó en reducciones significativas de operaciones y de personal. Dicha reorganización culminó con la consolidación de las operaciones de Qume en la planta de Las Piedras. Durante el año 1987, la gerencia de Qume decidió descontinuar todas sus operaciones en Puerto Rico y adoptó un plan de liquidación completa. La decisión sobre la liquidación fue comunicada al Gobernador de Puerto Rico mediante carta con fecha de 20 de octubre de 1987. El decreto de exención contributiva del cual disfrutaba Qume hasta ese momento fue revocado el 20 de noviembre de ese mismo año. Mediante dicha revocación, Qume dejó de ser entidad exenta, pero siguió operando a los fines de liquidar sus activos.[3]

Durante los años en controversia, 1985, 1986, 1987 y 1988, Qume generó IFI tributable. Sin embargo, como resultado del cierre de operaciones y liquidación, Qume incurrió en pérdidas en la liquidación de sus activos, voluntaria e involuntaria. También tuvo pérdidas atribuibles a robo. Las pérdidas fueron las siguientes:

| AÑO CONTRIBUTIVO | INGRESO IFI (10%) | PÉRDIDAS- |
|---|---|---|
| 1985 | $773,095 | $997,837 |
| 1986 | 101,010 | 169,210 |
| 1987 | (98,413) | 675,370 |
| 1988 | -- | 5,683,093 |

Al radicar las planillas de contribución sobre ingresos para los años 1985, 1986 y 1987, Qume dedujo todas las pérdidas que tuvo el proceso de liquidación de activos, del 10% de su IFI tributable, por lo que el resultado fue que Qume sólo tuvo pérdidas netas durante esos años. El Secretario rechazó la deducción, lo que produjo deficiencias contributivas para el año 1985 de $609,829 y para el año 1986 en la cantidad de $51,044.99. Por otra parte, el Secretario reconoció un reintegro de $208,835.00 para el año 1988 por contribuciones pagadas en exceso de otros años y los aplicó a las deficiencias antes señaladas.

El caso se tramitó en el foro administrativo, culminando en una vista y una notificación final de deficiencia con fecha de 3 de noviembre de 1993. Qume impugnó la referida notificación ante el Tribunal de Primera Instancia, donde radicó la presente acción el 29 de noviembre de 1993.

Las partes estipularon los hechos reseñados y en vista celebrada el 14 de noviembre de 1994, reafirmaron sus respectivas posiciones. El Secretario alegó que Qume no podía compensar el ingreso neto tributable, ascendiente al 10% proveniente de sus operaciones parcialmente exentas bajo la Ley de Incentivos Industriales, contra las pérdidas de otras fuentes totalmente tributables. Adujo además que para fines del decreto de exención

---

[2] En el caso de autos la empresa comenzó a generar ingresos no exentos cuando inició el proceso de liquidación.

[3] Qume radicó su última planilla de contribuciones, ya como entidad no exenta, en el año 1988.

contributiva de Qume,[4] bajo el cual la corporación se acogió a la exención, Qume tenía, para los años en controversia, dos negocios distintos: el de producción, cuyos ingresos estaban parcialmente exentos de contribuciones bajo la Ley de Incentivos Industriales, y el de liquidación de activos, actividad comercial no exenta bajo dicha Ley. Por esta razón, alega el Secretario, Qume debió ser considerada como dos entes contributivos, uno que tributa de acuerdo a la Ley de Incentivos Industriales y otro involucrado en actividades comerciales no cubiertas por la dicha Ley y que por tanto, tributa bajo las disposiciones de la Ley de Contribución sobre Ingresos de 1954, Ley Núm. 91 de 29 de junio de 1954, según enmendada, 13 L.P.R.A. Sec. 3001 *et seq.* (en adelante Ley de Contribuciones sobre Ingresos).

Por su parte, Qume argumentó que el no permitir la compensación menoscabaría sus derechos bajo la Ley de Incentivos Industriales y bajo el decreto de exención, debido a que la Ley de Incentivos Industriales no es propiamente una ley de contribución sobre ingresos, sino una ley que determina una exención contributiva. Como tal, el ingreso tributable que resulte de las operaciones de una corporación exenta está sujeto a las normas de tributación establecidas en la Ley de Contribución sobre Ingresos, y bajo dichas normas, el IFI debe considerarse parte del ingreso bruto de la corporación.

El 13 de diciembre de 1995, el foro de instancia dictó sentencia declarando con lugar la demanda de Qume. En la misma dejó sin efecto las deficiencias contributivas para los años 1985 y 1986, y ordenó el reintegro solicitado por Qume de la contribución pagada en exceso para el año 1988.[5] Inconforme, el Secretario presentó apelación ante el Tribunal de Circuito, el cual confirmó la sentencia apelada. Concluyó que, en ausencia de disposición de ley que indique lo contrario, el IFI tributable de una corporación es parte del ingreso bruto de la misma, de acuerdo con las normas establecidas en la Ley de Contribución sobre Ingresos y los Principios Generalmente Aceptados de la Contabilidad (G.A.A.P. por sus siglas en inglés). Por lo tanto, a esa porción tributable del IFI pueden compensarse ("off set") pérdidas de la corporación surgidas de operaciones no exentas de dicha corporación. De esta determinación el Secretario recurrió ante nos mediante recurso de certiorari, señalando como único error el siguiente:

> ERRO EL TRIBUNAL DE CIRCUITO DE APELACIONES AL DETERMINAR QUE LAS PERDIDAS OPERACIONALES CUBIERTAS POR UN DECRETO DE EXENCIÓN CONTRIBUTIVA PUEDEN COMPENSARSE CONTRA EL INGRESO DE ACTIVIDADES NO CUBIERTAS POR UN DECRETO

Luego de varios trámites procesales, el 11 de julio de 1997, este Tribunal denegó el auto de certiorari solicitado. El Secretario solicitó reconsideración. Alegó que la sentencia recurrida no hace un análisis integral de la Ley de Contribuciones sobre Ingresos

---

[4] El decreto de exención contributiva es el acuerdo firmado entre una corporación que cualifique para la exención y el gobernador, mediante el cual la corporación se acoge formalmente a la exención. En dicho decreto se detallan, entre otras cosas, las condiciones bajo las cuales la corporación se acoge a la exención y el tiempo durante el cual la disfrutará de la misma.

y la Ley de Incentivos Industriales al concluir que no existe disposición de ley o reglamento que excluya el IFI tributable de los términos generales de la Ley de Contribución sobre Ingresos. Además sostuvo que la decisión recurrida, al sustituir el criterio adoptado por el Secretario con relación al cobro de contribuciones de corporaciones exentas bajo la Ley de Incentivos Industriales por los G.A.A.P. tiene el efecto de limitar el poder constitucional del Estado para imponer contribuciones, poder que se ejerce a través de la figura del Secretario.

El 9 de octubre de 1997, en reconsideración, expedimos el recurso de certiorari a los fines de revisar la sentencia dictada por el Tribunal de Circuito. Ambas partes han presentado sus alegatos y con el beneficio de sus comparecencias procedemos a resolver.

II

Qume alega que el tribunal no tiene jurisdicción para considerar el recurso presentado por el Secretario debido a falta de notificación adecuada de la deficiencia contributiva, y por haber prescrito el período establecido en la Ley de Contribuciones sobre Ingresos y su Reglamento, para el cobro de las referidas deficiencias.[6] Pasemos primero a analizar la figura procesal de la notificación formal.

La notificación formal, al igual que la mayoría de los derechos, es renunciable. Su propósito es informarle a la parte demandada del procedimiento y reclamación en su contra para que ésta pueda comparecer a defenderse si así lo desea. First Bank of P.R. v. Inmob. Nac., Inc., PC de 2 de marzo de 1998, 98 JTS 18; Márquez v. Barreto, Op. de 19 de mayo de 1997, 97 JTS 66. No cabe duda que un contribuyente puede someterse voluntariamente al procedimiento administrativo para cuestionar las deficiencias contributivas determinadas por el Secretario, haciendo de esta forma innecesaria la notificación formal que provee la ley.

La figura de la sumisión consiste en que una parte comparece voluntariamente y realiza algún acto sustancial que la constituya parte en el pleito, sometiéndose así a la jurisdicción del Tribunal. Echevarría Jiménez v. Sucesión Pérez, 123 D.P.R. 664 (1989); Mercado v Panthers Military Society, 125 D.P.R. 98 (1990). Reiteradamente hemos resuelto que la comparecencia voluntaria de la parte demandada suple la omisión del emplazamiento y es suficiente para que la corte adquiera jurisdicción sobre la persona. Franco v Corte, 71 D.P.R. 686 (1950); Méndez v. Sucesión Sella, 62 D.P.R. 345 (1943).

Aunque la sumisión es una figura propia del procedimiento civil, nada impide que en casos apropiados se adopten normas de las Reglas de Procedimiento Civil para guiar el curso

---

[5] Dicho reintegro asciende a $208,835.
[6] Este planteamiento fue desestimado tanto por el tribunal de instancia como por el Tribunal de Circuito.

de procedimientos administrativos,[7] <u>Pérez v Puerto Rico Park Systems</u>, 119 D.P.R. 634 (1987); <u>Berríos v Comisión</u>, 102, D.P.R. 228 (1974). Una de las disposiciones de las Reglas de Procedimiento Civil adoptadas por la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. sec. 2101, *et seq* (en adelante L.P.A.U.), lo es el procedimiento de notificación a vista. 3 L.P.R.A. sec. 2159.[8] Al examinar los requisitos de la notificación a vista, no es difícil llegar a la conclusión de que ésta tiene el mismo propósito del emplazamiento de las Reglas de Procedimiento Civil.

Como colorario, si una persona puede someterse a la jurisdicción de un tribunal sin haber sido emplazado debidamente, análogamente, una persona puede someterse al procedimiento administrativo aunque la notificación de la agencia haya sido deficiente, con las mismas consecuencias que conlleva la sumisión en el procedimiento civil. Esta determinación está en armonía con la norma de que en los procedimientos ante las agencias administrativas se adoptarán las reglas de procedimiento civil y de evidencia que sean compatibles con la rapidez y la relativa informalidad que deben prevalecer en los procedimientos administrativos.

Ahora bien, la prescripción, por su parte, es una defensa afirmativa, también renunciable. <u>Meléndez v. El Vocero de Puerto Rico</u>, Op. de 24 de noviembre de 1997, 97 JTS 139; <u>López v. J. Gus Lallande</u>, Op. de 4 de febrero de 1998, 98 JTS 9. Ésta hay que plantearla oportunamente, sino, se entiende tácitamente renunciada. El propósito de la prescripción extintiva es que "las reclamaciones válidas se ejerzan con premura y no se abandonen." <u>B.W.A.C. Int'l v. Quasar Co.</u>, 138 D.P.R. 60, 88. "La institución de la prescripción extintiva se fundamenta en el imperativo de castigar la inercia en el ejercicio de los derechos y evitar litigios difíciles de adjudicar por la antigüedad de las reclamaciones". <u>Matos Molero v. Roche Products, Inc.</u>, 132 D.P.R. 470, 487.

En cuanto al término prescriptivo para que el Secretario cobre una contribución, la sec. 275(a) de la Ley de Contribuciones sobre Ingresos, 13 L.P.R.A. § 3275, indica que el monto de contribuciones sobre ingresos será tasado dentro del término de cuatro (4) años después de haberse radicado la planilla. La sec. 275(b) dispone además que, si el contribuyente lo solicita por escrito, la contribución deberá tasarse y cobrarse dentro de los dieciocho (18) meses siguientes a la radicación de la solicitud. Ésto es lo que

---

[7] Aunque los procedimientos de notificación de deficiencias contributivas y tasación en peligro se rigen por la Ley de Contribuciones sobre Ingresos, el procedimiento administrativo ante el Departamento de Hacienda se rige por las disposiciones de la Ley de Procedimiento Administrativo Uniforme.

[8] La L.P.A.U. recoge algunos principios de las Reglas de Procedimiento Civil aplicables a los procedimientos administrativos, entre éstos: la conferencia con antelación a la vista, los mecanismos de descubrimiento de prueba, procedimientos en rebeldía, y los procedimientos de reconsideración. Ley de Procedimiento Administrativo Uniforme, Arts. 3.5-3.15, 3 L.P.R.A. secs. 2155-2165.

se conoce como "tasación pronta". Una de las situaciones en las cuales el contribuyente puede solicitar este tipo de tasación es cuando una corporación o sociedad proyecta disolverse en o antes de la expiración de dicho término.[9]

La Ley de Contribución sobre Ingresos también establece unas excepciones al término prescriptivo para tasar y cobrar una contribución. A estos efectos, la Sec. 276 de la ley, 13 L.P.R.A. sec. 3276 dispone:

> **Excepciones al periodo de prescripción.**
> (a)
> (b) *Renuncia*- Cuando antes de la expiración del periodo prescrito en la sec. 3275 de este título para la tasación de la contribución, ambos, el Secretario y el contribuyente, hubieren acordado por escrito tasar la contribución después de dicho período, la contribución podrá ser tasada en cualquier momento anterior a la expiración del período que se acuerde. El período así acordado podrá prorrogarse por acuerdos escritos sucesivos hechos antes de la expiración del período previamente acordado.(Énfasis suplido).

A la luz del derecho aplicable, procedemos al análisis detallado de los hechos del caso.

Debido a que Qume decidió cerrar sus operaciones en Puerto Rico, ésta solicitó, de acuerdo con las disposiciones de la Ley de Contribuciones sobre Ingresos, una tasación pronta, el 2 de marzo de 1989.

Luego, y a solicitud del Secretario, Qume suscribió tres consentimientos para extender el período prescriptivo de dieciocho (18) meses para la tasación correspondiente a los años 1985 y 1986, según lo permite la Ley, de la manera siguiente:

1. El 28 de agosto 1990 se extiende hasta el 28 de  febrero de 1991.

2. El 28 de febrero de 1991 se extiende hasta el 31 de agosto de 1991.

3. El 26 de agosto de 1991 se extiende hasta 31 de diciembre de 1991.

De acuerdo con estas extensiones, el término disponible para que el Secretario realizara la tasación y requiriese el pago de la contribución finalizaba el 31 de diciembre de 1991. En esa fecha el Secretario realizó, de acuerdo con lo dispuesto en la ley, una tasación en peligro ("jeopardy assessment").

La sec. 273 de la Ley, 13 L.P.R.A. § 3273 dispone:

> **Tasación de contribución en peligro.**
>
> (a)*Facultad para Tasar.*- Si el Secretario creyere que la tasación o el cobro de una deficiencia ha de peligrar por la demora, tasará inmediatamente dicha deficiencia junto con todos los intereses, cantidades adicionales o adiciones a la contribución provistos por ley, y hará la notificación y requerimiento para el pago de la misma (…)

El propósito principal de la tasación pronta o en peligro es evitar que, por el transcurso del término prescriptivo, el Secretario pierda su derecho a cobrar la contribución. Conforme a esta disposición, el Secretario realizó la tasación en peligro

---

[9]  Ley de Contribuciones sobre Ingresos, sec. 272(b)(1), 13 L.P.R.A. sec.3275 (b)(1).

el 31 de diciembre de 1991, fecha de vencimiento del último consentimiento otorgado por Qume.  Ese mismo día, Qume envió vía fax otro consentimiento, extendiendo el término para hacer la tasación hasta el 15 de abril de 1992.  Al recibir dicho consentimiento, el Secretario dejó sin efecto la tasación realizada el 31 de diciembre.

Así las cosas, el 11 de marzo de 1992, el Secretario emitió una notificación preliminar de deficiencia y, conjuntamente, envió a Qume una solicitud para que la corporación otorgase un nuevo consentimiento para extender el término prescriptivo hasta el 15 de abril de 1993, indicándole en dicha notificación que de no prestar dicho consentimiento, el Secretario se vería en la obligación de realizar una tasación preventiva o tasación en peligro.  Qume no otorgó el consentimiento requerido por el Secretario, por lo que el término para hacer la tasación continuó siendo el establecido por el último consentimiento, o sea, hasta el 15 de abril del 1992.

El Secretario procedió entonces con la tasación en peligro, la cual fue realizada y notificada a Qume mediante el formulario SC 2617, por correo regular, el 8 de abril de 1992.[10]  Al recibir esta notificación, Qume solicitó mediante carta con fecha del 9 de abril de 1992, una vista administrativa para impugnar las deficiencias determinadas por el Secretario.  En ese momento no hizo ningún planteamiento sobre falta de notificación adecuada y prescripción.[11]

El trámite administrativo siguió su curso regular, culminando con una notificación final de deficiencia enviada a Qume el 3 de noviembre de 1993.  En ésta se le advirtió de su derecho a impugnar dicha determinación ante el Tribunal de acuerdo con lo dispuesto en el Art. 4.1 de la L.P.A.U., 3 L.P.R.A. sec. 2171, y el Art. 272 de la Ley de Contribuciones sobre Ingresos, 13 L.P.R.A. sec. 3271. Qume ejerció efectivamente este derecho, presentando su demanda ante el foro de instancia impugnando la determinación final de deficiencia contributiva.

Durante los procedimientos ante el tribunal de instancia, Qume presentó una moción de sentencia sumaria en la cual alegó, por primera vez, la falta de autoridad del Secretario para cobrar la contribución, ya que la misma estaba prescrita.  El siguiente fragmento del alegato recoge los argumentos principales de Qume en cuanto a este planteamiento:

> ...La notificación enviada por correo regular en 8 de abril de 1992 no constituye la tasación en peligro ordenada por ley.  Note el tribunal que en [sic] 8 de abril únicamente se remitieron 2 notificaciones consistentes con la notificación preliminar de deficiencia previamente recibida en el mes de marzo. **No se le informó a la contribuyente que se estaba efectuando una tasación en peligro privándole de este modo de cualquier derecho a debido proceso que pudiera asistirle a Qume para rebatir tal tasación.** Contrasta significativamente tal notificación, que es un recibo que sale automáticamente del sistema, con la notificación y requerimiento previamente cursado el 31 de diciembre de 1991.  En esta ocasión, se le requirió a la

---

[10]    Cabe señalar que en esta notificación se señalaron deficiencias contributivas para los mismos años y en las mismas cantidades que en la notificación expedida por el Departamento de Hacienda el 31 de diciembre de 1991.

[11]    No surge del expediente que Qume haya levantado el planteamiento de prescripción ante el foro administrativo.

contribuyente el pago de la contribución tasada, se le informaba que se estaba efectuando la tasación en peligro, se le orientaba los efectos (...). Se acompañaba a la tasación una explicación y detalle de la contribución objeto de la tasación y se hacía la notificación por correo certificado con acuse de recibo.

Al no cumplirse con ninguna de las alternativas disponibles al secretario para evitar que prescribiera su derecho a cobrar la deficiencia determinada, éste perdió su capacidad para hacer efectivo el cobro de la contribución, tornándose académico el procedimiento administrativo iniciado previamente.

La sec. 272 (a)(1) de la Ley de Contribuciones sobre Ingresos, 13 L.P.R.A. sec. 3272 (a)(1), establece que en los casos los cuales el Secretario determine que hay una deficiencia con respecto a la contribución impuesta por ley, éste notificará al contribuyente dicha deficiencia por correo certificado, y el contribuyente podrá, dentro de los treinta (30) días siguientes a la fecha de depósito en el correo de la notificación, solicitar del Secretario, por escrito, la reconsideración de la determinación de deficiencia.

Por otra parte, la sec. 3273 de la ley establece que la tasación en peligro puede hacerse antes o después de notificar a la parte sobre la deficiencia, pero en todo caso, la notificación de dicha deficiencia, sea antes o después de la tasación en peligro, debe hacerse por correo certificado conforme a los requisitos establecidos en la sec. 3272. **La diferencia es que cuando la tasación en peligro se hace antes de la notificación de deficiencia, el Secretario tiene un término de treinta (30) días para hacer la notificación conforme a la ley.**

De acuerdo con estas disposiciones, tiene razón la parte recurrida cuando sostiene que el Secretario no hizo la notificación de acuerdo a lo establecido en la Ley, ya que ni la notificación del 11 de marzo ni la del 8 de abril fueron hechas por correo certificado. Sin embargo, la realidad es que Qume no puede argumentar que la falta de notificación conforme a los requisitos formales de la ley la colocó en un estado de indefensión tal que no le permitió defender adecuadamente su derecho, ni que el Secretario no tenía autoridad para cobrar la contribución por razón de prescripción.

Aunque la notificación del 8 de abril de 1992 no fue una notificación formal según la Ley, Qume se comportó frente a la misma tal y como si se tratase de una notificación final de deficiencia, ya que al próximo día solicitó, de acuerdo con la sec. 272(a)(1), una vista administrativa para impugnar la determinación del Secretario. Según esta sección, una vez el Secretario hace la notificación final de deficiencia por correo certificado, el contribuyente tiene treinta (30) días para radicar solicitud de reconsideración. Así lo hizo la recurrida Qume, sometiéndose al procedimiento administrativo, el cual duró más de un año.

Qume conocía perfectamente los trámites relativos a la concesión de consentimientos para extender el término prescriptivo, ya que había otorgado cuatro (4) de ellos, y conocía el procedimiento de tasación en peligro y sus consecuencias. Además, la propia Qume admitió que la notificación de deficiencia y tasación en peligro del 31 de diciembre de 1991 fue

completa y correcta, ya que le informaba todo lo relativo a la cantidad de la contribución debida, y los trámites a seguir para la revisión administrativa de la decisión del Secretario.

Por otra parte, es cierto que, tal como alega Qume, cuando el Secretario dejó sin efecto esta notificación, la misma dejó de ser eficaz y el Secretario debió haber comenzado el proceso nuevamente y hacer la subsiguiente notificación con las mismas formalidades de la primera. Sin embargo, todo esto se hizo innecesario ya que Qume prosiguió con el trámite administrativo establecido en la ley, sin impugnar en ningún momento durante dicho trámite las alegadas deficiencias en la notificación. No es difícil entonces llegar a la conclusión de que mediante sus actuaciones Qume se sometió a la jurisdicción de la agencia administrativa.

No debe interpretarse que esta conclusión a la cual llegamos pretende hacer menos rigurosos los procedimientos cuasi judiciales llevados a cabo por las agencias administrativas. El requisito de notificación adecuada es medular como parte del debido proceso de ley de cualquier persona natural o jurídica que esté involucrada en un procedimiento administrativo. No obstante, el propósito principal de una notificación adecuada queda plenamente satisfecho si la parte se somete a los procedimientos administrativos voluntariamente y con pleno conocimiento de lo que allí se va a dilucidar.

Cabe señalar que, según surge del expediente, no fue hasta que terminó el procedimiento administrativo donde se impugnó la determinación de deficiencia contributiva, o sea, casi dos años después de haber comenzado el trámite administrativo de impugnación de la imposición de la contribución, y luego de recibida por Qume la notificación final de Hacienda comunicándole que se sostuvo la determinación inicial del Secretario en cuanto a la deficiencia contributiva, que la corporación, mediante Moción de Sentencia Sumaria, hizo el planteamiento a los efectos de que la contribución estaba prescrita. Ante estas circunstancias, es necesario concluir que Qume renunció a la defensa de prescripción, ya que no invocó la misma oportunamente.

III

Atendidos los planteamientos de falta de notificación adecuada y prescripción, pasamos a considerar la controversia principal del caso, ésta es, determinar si, una vez se determina el por ciento tributable del IFI, éste pasa a formar parte del ingreso bruto total de la corporación, al cual se le pueden compensar ("off set") o deducir cualquier pérdida proveniente de operaciones no exentas de la corporación para computar el total de ingreso neto tributable de la corporación. Para resolver esta controversia es necesario, en primer lugar, hacer una explicación de las disposiciones aplicables de la Ley de Incentivos Industriales de Puerto Rico.

En términos generales, la Ley de Incentivos Industriales otorga una exención contributiva para negocios que se establezcan en una "zona de alto desarrollo industrial" sobre el IFI derivado a partir de la fecha del comienzo de sus operaciones, según tal comienzo se determine por el Secretario conjuntamente con el Administrador de Fomento Económico, o el Gobernador, en caso de que aquellos no lleguen a un acuerdo a estos fines. 13 L.P.R.A § 10012(a)(1).

En lo pertinente al asunto que nos ocupa, la sec. 10013 de la ley dispone lo siguiente:

**Definiciones:**

*Ingreso de Fomento Industrial.*–Será ingreso de fomento industrial:
  (1) El ingreso neto derivado de la producción de un producto manufacturado que motiva la exención.

Una corporación interesada en obtener una exención contributiva bajo esta ley, tiene que hacer una solicitud al Gobernador, estableciendo que sus operaciones cualifican para la exención y que cumple con los demás requisitos de ley para la concesión de la misma. Una vez se determina que la corporación cualifica para la exención contributiva solicitada, ésta se hace efectiva a través de lo que se conoce como un decreto de exención. En este decreto se especifican las condiciones mediante las cuales se otorga la exención contributiva, el por ciento de dicha exención, y el término de duración de la misma, entre otras condiciones. La recurrida en este caso operaba bajo la exención contributiva establecida en la Ley de Incentivos Industriales, según el decreto de exención contributiva número 77-57-I-212, otorgado a ésta por el Gobernador el 29 de abril de 1978.

Conforme al decreto de exención, Qume disfrutaba de una exención contributiva del 90% de su IFI. Por lo tanto, Qume tributaba sobre el 10% de su IFI. Ésta era la única partida de ingresos sobre la cual Qume tributaba desde que se le concedió el decreto, ya que todas sus operaciones cualificaban como operaciones exentas bajo la Ley.

Según surge de los hechos, no fue hasta el año 1985 cuando por primera vez Qume comenzó a tener pérdidas sustanciales en sus operaciones. Fue entonces cuando decidió cerrar en Puerto Rico y comenzar su proceso de liquidación. Como parte de este proceso, Qume procedió con la venta de los activos de la corporación. Las operaciones de disposición de activos de la corporación no estaban cubiertas bajo la Ley de Incentivos Industriales, por lo que dicha liquidación constituyó la primera actividad de Qume cuyos ingresos no estarían exentos bajo la Ley.

Las desavenencias con el Secretario surgen en los años contributivos para los cuales Qume comenzó a tener operaciones no exentas, como resultado del proceso de liquidación de activos. Al radicar sus planillas de contribuciones sobre ingresos para esos años, específicamente durante el 1985 y el 1986, Qume, luego de computar el IFI tributable, dedujo de éste las pérdidas obtenidas como resultado de la liquidación de sus activos, actividad que, como ya señaláramos, no está exenta bajo la Ley de Incentivos Industriales. Como resultado de dichas deducciones, las planillas de Qume reflejaron pérdidas netas para los

años 1985 y 1986. En el momento en que Qume solicitó del Secretario la tasación pronta de las contribuciones adeudadas por motivo del cierre de sus operaciones, el Secretario notificó las deficiencias contributivas que desembocaron en todo el proceso administrativo y judicial habido en este caso.

El argumento principal del Secretario para rechazar la deducción es que, al ser la totalidad del IFI un ingreso exento, es un ingreso distinto al ingreso totalmente tributable (no cubierto por el decreto de exención), aún después de computada la cantidad del IFI que está sujeta al pago de contribución. Por ser ingresos de distinta naturaleza, las pérdidas provenientes de ingresos totalmente tributables no pueden compensarse contra la porción tributable del IFI. Mientras que la posición de Qume, con la cual coinciden tanto el tribunal de instancia como el Tribunal de Circuito, es que el por ciento tributable del IFI es parte del ingreso bruto de la corporación y, por tanto, la corporación tiene derecho a compensar contra el IFI tributable las pérdidas de sus otras operaciones no exentas para calcular el ingreso neto tributable, tal como podría deducir dichas pérdidas contra cualquier otra clase de ingreso bruto. Para sostener esta posición, el Tribunal de Circuito se apoya en lo establecido en la Ley de Contribuciones sobre Ingresos en referencia a las definiciones de Ingreso Neto, Ingreso Bruto, y las deducciones permitidas por dicha ley, y en los G.A.A.P.

De las posiciones de las partes podemos concluir que la controversia principal planteada en este caso es si, en efecto, el IFI tributable forma parte del ingreso bruto de una corporación o si, por el contrario, la ley lo considera una partida de ingresos separada y distinta de cualquier otro ingreso totalmente tributable producto de operaciones no exentas de la corporación.

Según la Ley de Contribuciones sobre Ingresos, el ingreso neto significa el ingreso bruto computado de acuerdo con la sec. 3022 de éste título, menos las deducciones admitidas por la sec. 3032 de este título, 13 L.P.R.A. sec. 3021. Por su parte, la sec. 3022 dispone, en lo pertinente:

> **Ingreso bruto**
> (a) *Definición General.-* "Ingreso bruto" incluye ganancias, beneficios e ingresos derivados de sueldos, jornales, compensación por servicios personales (...) de cualquier clase y cualquiera sea la forma en que se pagaren; o de profesiones, oficios, industrias, negocio, comercio o ventas; o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso o del interés en tal propiedad; también los derivados de intereses, rentas, dividendos, beneficios de sociedades, valores de la operación de cualquier negocio explotado con fines de lucro o utilidad; y ganancias o beneficios e ingresos derivados de cualquier otra procedencia. (Énfasis suplido)

La Ley de Contribuciones sobre Ingresos también señala que el monto de todas las partidas de ingreso bruto será incluido en el ingreso bruto para el año contributivo en que sean recibidas por el contribuyente, 13 L.P.R.A. sec. 3042.

Qume sostiene que dentro de la amplia definición de ingreso bruto contenida en la Ley de Contribuciones sobre Ingresos, y en ausencia de disposición legal que lo excluya, el IFI tributable debe considerarse ingreso bruto, como "ganancia o beneficio e ingreso

derivado de cualquier otra procedencia", los cuales en este caso, son las operaciones exentas de Qume bajo el decreto. A esta conclusión también llega el Tribunal de Circuito fundamentándose no sólo en las disposiciones legales ya mencionadas, sino además en los G.A.A.P. (por sus siglas en inglés). La relación entre la Ley de Contribuciones sobre Ingresos y los GAAP, la explica el Tribunal de Circuito de la manera siguiente:

> La Ley de Contribuciones sobre Ingresos [supra] define la forma en que algunas transacciones serán tratadas y, además, establece ciertos parámetros a utilizarse en el cómputo de "ingreso neto" sobre el cual se basan las contribuciones sobre ingresos. En cuanto a los cómputos restantes, dicha ley presume que los mismos se harán en forma consistente con los principios de contabilidad generalmente aceptados y utilizados en la preparación de los estados financieros de la corporación. También, si la Ley de Contribuciones sobre Ingresos u otra legislación pertinente no dispone sobre la manera de llevar a cabo determinado cómputo, el mismo debe hacerse conforme a los principios de contabilidad generalmente aceptados.[12]

Continúa exponiendo el tribunal apelativo que uno de los principios generalmente aceptados de la contabilidad es que al calcular el ingreso de una entidad, se agregan todas las fuentes del ingreso bruto. Así, si las fuentes incluyen ganancias y pérdidas, se compensan las unas con las otras y el ingreso neto será la suma de todas ellas.[13] Concluye en tribunal recurrido señalando que "la parte que sostenga que se deben excluir del ingreso bruto ciertas fuentes de ingreso, tiene que justificar el trato excepcional basándose en la Ley de Contribuciones sobre Ingresos, su Reglamento, u otra Legislación pertinente".[14]

El Tribunal de Circuito concluye que, de acuerdo a las definiciones de ingreso neto e ingreso bruto contenidas en la ley, el hecho de que entre las exclusiones al ingreso bruto que señala la sec. 22 de la Ley de Contribuciones sobre Ingresos no se incluye la exclusión del IFI de una corporación; que la sec. 23(g) de la referida ley permite expresamente las deducciones por pérdidas de capital; y que nada en la Ley de Incentivos Industriales indica lo contrario, el IFI tributable de Qume forma parte del ingreso bruto de ésta y, por lo tanto, se le aplican las normas anteriormente citadas, procediendo al deducción de la pérdida por la disposición y liquidación de activos contra el IFI.

Frente a esta conclusión del tribunal apelativo, el Departamento de Hacienda sostiene que el Reglamento de la Ley de Contribuciones sobre Ingresos excluye el IFI del ingreso bruto en la medida en que leyes especiales le eximen de contribución sobre ingresos. El Art. 22(b)1 del reglamento dispone:

---

[12] Sentencia del Tribunal de Circuito de Apelaciones, caso KLAN 9600107, página 12.

[13] El Tribunal de Circuito hace referencia a *APB Statement No. 4, Basics Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises,* New York, AICPA, 1970, y al tratado de Sidney Davidson y Roman Weil, *Handboook of Modern Accounting,* 3rd. ed., McGraw Hill, New York, 1983. Como no está en controversia que efectivamente el precepto citado sea un principio generalmente aceptado de la contabilidad, aceptamos estas fuentes como vinculantes para la definición, exposición y explicación de dichos principios, sólo para el caso ante nos.

[14] Sentencia del Tribunal de Circuito de Apelaciones, caso KLAN 9600107, página 12.

*Exenciones; exclusiones del ingreso bruto.*
– Ciertas partidas de ingreso especificadas en la sección 22(b) están exentas de contribución y pueden ser [excluídas] del ingreso bruto. Estas partidas, sin embargo, están exentas solamente en la medida y cantidad especificadas. Ninguna partida puede ser [excluída] del ingreso bruto excepto (a)...; (b) aquellas partidas de ingreso que estén exentas de contribución sobre ingresos por las disposiciones de cualquier Ley del Congreso de los Estados Unidos o de la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico todavía en vigor; y (c)....".

El Secretario, amparándose en esta disposición del Reglamento y el hecho de que la Ley de Incentivos Industriales dispone que todo ingreso obtenido de operaciones contempladas en la ley se considera IFI, interpreta que para efectos de la ley, todo el IFI se considera ingreso exento y, como tal, la excepción establecida en la disposición en el Art. 22(b)-1 del Reglamento aplica a todo el IFI, tanto el estrictamente exento como el por ciento tributable del mismo. Concluye el Secretario en su alegato que un análisis integrado del Art. 22 (b)-1 del reglamento y la sec. 3101 de la Ley de Contribución sobre Ingresos debe llevar a la conclusión de que el IFI por ser ingreso exento por la Ley de Incentivos Industriales, está excluido de tributación bajo las leyes de contribuciones sobre ingresos. No podemos estar de acuerdo con esta contención del Secretario. La secc. 101 del Suplemento A de la Ley de Contribuciones sobre Ingresos, 13 L.P.R.A. sec. 3101, la cual dispone:

**Exenciones de Contribución sobre Corporaciones**.
Las siguientes organizaciones están exentas de contribución bajo este Subtítulo–
(21) Sujeto a los requisitos de la Ley núm. 184, aprobada el 13 de mayo de 1948, de las secciones 241–251 de este título, las secs. 252 a 252j de este título,[15] y de cualquier otra ley que las sustituya o complemente, y hasta el límite provisto en dichas leyes, las entidades que hayan obtenido u obtengan exención contributiva bajo tales leyes (...). (Énfasis suplido.)

Como puede observarse, la ley dispone claramente que las corporaciones acogidas a los beneficios de la Ley de Incentivos Industriales están exentas de tributación bajo la ley de contribuciones sobre ingresos **hasta el límite provisto en dicha ley**. En el caso específico de la Ley de Incentivos Industriales, en la forma en que aplica la misma a Qume según el decreto de exención, el límite provisto por la Ley que está exento de tributación es el 90%. En cuanto al restante 10%, no cabe duda de que tributa bajo la Ley de Contribución sobre Ingresos, ya que no existe otra ley aplicable a Qume bajo la cual el ingreso no exento pueda tributar.

La Ley de Incentivos Industriales no es una ley de contribución sobre ingresos. Su propósito es establecer una exención contributiva a empresas que se dedican a ciertas actividades económicas que el estado, en el momento histórico en el cual se aprueba esta ley, deseaba fomentar e incentivar. La Ley de Incentivos Industriales establece cuáles son dichas actividades exentas, la manera en que las corporaciones pueden solicitar la exención, el término de duración de la misma, la forma en la cual la exención se hace vigente,

---

[15] Estas secciones son las que se refieren a la Ley de Incentivos Industriales de 1963, que actualmente ocupan las secs. 10012 a 10023 del título 13 de L.P.R.A.

las opciones que tiene la corporación para acogerse a la exención, y otros extremos; pero no contiene disposiciones propias de una ley de contribución sobre ingresos o un código de rentas internas.  Por tanto, la ley aplicable al IFI tributable en cuanto al proceso de tributación como tal, no es otra que la Ley de Contribuciones sobre Ingresos.

No obstante, el que lleguemos a esta conclusión con relación a la aplicabilidad de la Ley de Contribuciones sobre Ingresos al IFI, no dispone completamente de este recurso.  El Secretario plantea que el IFI es un ingreso separado y distinto de cualquiera otros ingresos de la corporación que sean totalmente tributables.  Al hacer un análisis integrado del Reglamento de la Ley de Contribuciones sobre Ingresos y la Ley de Incentivos Industriales, consideramos que el Secretario tiene razón en su planteamiento.

El Tribunal de Circuito concluyó en su sentencia que las disposiciones generales de la Ley de Contribuciones sobre Ingresos y los principios generalmente aplicados de la contabilidad regían en la determinación sobre el carácter de ingreso bruto del IFI, ya que no existe disposición de ley que disponga que el IFI debe tratarse de manera distinta a cualquier otro ingreso tributable de la corporación.  Discrepamos de esta conclusión del tribunal apelado, ya que la Ley de Incentivos Industriales y el Reglamento de la Ley de Contribuciones sobre Ingresos no sostienen dicha conclusión.

La sec. 5(e)(2) de la Ley de Incentivos Industriales del 1963, 13 L.P.R.A. sec. 10016 establece lo siguiente:

> **Administración**
> (e) *Informes.—*
>      (1)
>      (2) *Otros informes.—* Toda persona natural o jurídica acogida a los beneficios de este Subtítulo, estará en la obligación (...) de radicar anualmente con el Secretario de Hacienda de Puerto Rico, de acuerdo con la Ley de Contribuciones sobre Ingresos en vigor, pero independientemente de la cantidad de su ingreso bruto o neto, una planilla de ingresos separada además de aquélla que por otros motivos vinieron obligados a rendir en relación con las operaciones de la industria objeto de exención; de mantener, separadamente, la contabilidad relativa al negocio exento (...) (Énfasis suplido.)

Por otra parte, el Reglamento establece que:

> Artículo 101 (21)-1— *Exención contributiva temporal para industrias nuevas y hoteles.*—(a) ...
> (b) Toda persona natural o jurídica que posea una concesión de exención contributiva está obligada, bajo las disposiciones de las Leyes Núm. 184 y Núm. 6,[16] a radicar anualmente (...) e independiente del monto de su ingreso

---

[16] Aún cuando el Reglamento se refiere a la Ley Núm 6 de 15 de diciembre de 1953, conocida como la Ley de Incentivos Industriales de 1954, en la sección 5(e)(2) de la Ley de Incentivos Industriales del 1963, 13 L.P.R.A. sec. 10016 (e)(2), ya citada, se impone el mismo requisito, por lo cual esta disposición del Reglamento es igualmente aplicable.  No obstante, cabe señalar que la Ley de Incentivos Industriales de Puerto Rico de 1978, ley núm. 26 del 2 de junio de 1978, no exige expresamente la radicación de una planilla separada, sino que señala en lo pertinente lo siguiente:
§10034. Informes y obligaciones
        (a)  El negocio exento estará en la obligación de:
             (1)  ...
             (2)  radicar anualmente ante el Secretario de Hacienda, de acuerdo con la Ley de Contribuciones sobre Ingresos en

bruto o neto, <u>una planilla separada</u> de contribución sobre ingresos, <u>además de la que pueda estar, de otro modo, obligada a rendir en relación con la operación de la industria u hotel objeto de la exención.</u> (Énfasis suplido.)

Según se desprende de la lectura de las disposiciones anteriormente citadas, de acuerdo con la Ley de Incentivos Industriales y el Reglamento de la Ley de Contribuciones sobre Ingresos, el IFI se considera un ingreso separado de cualesquiera otros ingresos tributables de la corporación, lo cual queda demostrado con la exigencia de estas disposiciones de ley y reglamento de que se rinda una planilla separada y distinta en la cual se informen los ingresos de fomento industrial de la corporación. Resulta evidente que la intención del legislador es que en esa planilla separada se haga constar únicamente el IFI. La razón de este requisito impuesto en la ley no puede ser otra que clasificar al IFI como un ingreso efectivamente distinto y separado de los demás ingresos de la corporación para fines de tributación. Siendo esto así, es forzoso concluir que la Ley de Incentivos Industriales y el Reglamento de la Ley de Contribución sobre Ingresos, al exigir que se informe el IFI en una planilla separada, excluye la posibilidad de que se puedan compensar contra el IFI tributable pérdidas por otras operaciones de la corporación que sencillamente se informan en otra planilla.

Por otra parte, al examinar el decreto mediante el cual Qume se acogió a la exención, nos llevará a la misma conclusión, cónsona con la disposiciones de ley y reglamento. En lo pertinente, el decreto de Qume lee de la siguiente manera:

> "BE IT FURTHER DECREED, that as a condition to the continuance of the tax exemption hereby granted <u>the grantee shall be required, in conformance with section 5(e) of Act No. 57, supra,…to file annually with the Secretary of the Treasury of the Commonwealth of Puerto Rico pursuant to the Income Tax Law in force, but independently of the amount of its gross or net income, a separate income tax return in addition to that which it may otherwise be under the obligation to file in relation to operations of the industry object of the exemption</u>; to keep, separately, the accounting records relative to the industry declared exempt…
>
> BE IT FURTHER DECREED, that the grantee shall operate business covered by the grant in good faith and in accordance with principles of normal business operations, and shall not willfully attribute to the operations and accounts for the activities carried on in Puerto Rico or any other place <u>which are not part of the operations of the tax exempt business covered by this grant</u>;
> BE IT FURTHER DECREED, that the Secretary of the Treasury of the Commonwealth of Puerto Rico, in determining what properly has been used in and what income has been derived from the industrial operations of the grantee hereby declared tax exempt, may review the accounts and records of the grantee to determine that all the purchase prices, sales prices, (…) are fixed on the basis of the normal business and not for the purposes of avoiding taxes ordinarily chargeable to activities not within the scope of the industrial operations hereby declared tax exempt…"

De una simple lectura, se puede colegir con meridiana claridad que el decreto de exención expresamente dispone que Qume mantendría separadamente, todas las operaciones contributivas del negocio exento, inclusive la radicación de la planilla de contribución sobre ingresos, sin que le fuese permitido asignar o reasignar pérdidas de una operación

---

vigor, una planilla de ingresos en relación con sus operaciones;

exenta a la operación tributable, o viceversa. Cabe señalar además que la sec. 5(a) de la ley dispone que las concesiones de exención contributiva que se conceden de acuerdo a la Ley de Incentivos Industriales "se considerarán de la naturaleza de un contrato entre el cesionario y el Estado Libre Asociado de Puerto Rico. El Gobernador podrá incluir en las concesiones de exención contributiva concedidas bajo este subtítulo aquellos términos y condiciones que, a su juicio, promuevas los propósitos de fomento industrial de este subtítulo." 13 L.P.R.A. sec. 10016.

Vemos pues que, según la propia ley, el decreto de exención tiene carácter de contrato entre el Estado y el contribuyente. Es norma establecida en nuestro ordenamiento que los contratos obligan al cumplimiento de lo pactado y todas sus condiciones, siempre que no sean contrarios a la ley, la moral y el orden público. Art. 1210 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3375. Si los términos de un contrato son claros, y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471. Según discutido anteriormente, el decreto de Qume no es contrario a la ley, pues hemos visto que la misma exige, a los fines de tributación, que los ingresos de fomento industrial se mantengan separados de los ingresos de otra naturaleza que obtenga la corporación. Y el contrato es claro en cuanto al carácter separado de la contribución.

Por último, deseamos llamar la atención a un documento preparado por el Departamento de Hacienda que ha abonado a la controversia surgida en este caso. Se trata del formulario conocido como Anejo G, el cual tiene el propósito de simplificar el trámite de radicación de planillas de contribución sobre ingresos a corporaciones que, como Qume, tengan operaciones exentas y no exentas bajo la Ley de Incentivos Industriales. Ante la exigencia de la Ley a los efectos de que la corporación que tuviese esta dicotomía de ingresos rindiese planillas separadas, el Departamento de Hacienda creó el formulario Anejo G. En términos generales, este formulario tiene dos columnas. En la columna derecha se hace constar el ingreso de las operaciones no exentas de la corporación, ganancias o pérdidas. En la columna izquierda se hace constar el IFI de la corporación, y se calcula, luego de hacer las deducciones que la ley permite, la porción del IFI que está exenta de contribución, y la porción del IFI que es tributable. El resultado es que al final de la columna izquierda constará el IFI tributable, y en la columna derecha constará el ingreso o pérdida resultada de las operaciones no exentas de la corporación.

La última línea del Anejo G permite que se sumen la columna izquierda y la derecha, para calcular el ingreso total tributable de la corporación. Este formulario se une a la planilla de contribución sobre ingresos, para así poder rendir una sola planilla.[17] El

---

(3) mantener en Puerto Rico, separadamente, la contabilidad relativa al negocio exento;...

[17] El Secretario de Hacienda plantea que el uso de este anejo justifica la forma en que el Secretario interpreta que debe tributar el IFI, ya que

conflicto que conlleva el Anejo G es que éste específicamente señala que solamente se podrán sumar la columna izquierda y la derecha (IFI tributable e ingreso totalmente tributable) si el resultado en ambas columnas es ganancia. No obstante, si el resultado de cualquiera de las columnas fuese menor de cero, es decir, una pérdida, las instrucciones del Anejo G indican que no pueden sumarse ambas cantidades.

Este Anejo G fue utilizado por Qume al radicar su planilla de contribución sobre ingresos, pero, contrario a lo que establecían las instrucciones del mismo, la corporación sumó las columnas izquierda y derecha aún cuando el resultado de la columna derecha (la de ingresos totalmente tributables) fue una pérdida. El resultado final fue que al sumarse ambas cantidades, Qume terminó declarando pérdidas netas para los años 1985 y 1986, ya que en ambos años contributivos, la pérdida por operaciones no exentas de la corporación fue mayor que el IFI tributable.

El Tribunal de Circuito concluyó en su sentencia que resulta injusto que se permita al Secretario que sume las partidas exentas y no exentas cuando ambas reflejan ganancias, pero que no se le permita al contribuyente unir una y otra partida cuando las mismas reflejen pérdidas. Entendemos que este razonamiento encierra cierta lógica; no obstante, luego de hacer el análisis ponderado de las disposiciones de ley y reglamento aplicables, y del decreto de Qume, llegamos a la conclusión de que no existe tal contradicción. El propósito del Anejo G no es brindarle al Secretario la oportunidad de cobrar una contribución mayor que la permitida por ley. El propósito del Anejo G es evitar que una corporación que tenga operaciones exentas y no exentas, y ambas reporten ganancias, tenga que rendir 2 planillas distintas, aun cuando, separadas o conjuntas, el monto total de contribuciones sobre ingresos que Hacienda tendría derecho a cobrar sería el mismo. Por otra parte, aunque una partida resulte en ganancia y la otra en pérdida, el Anejo G es útil, ya que permite mantener ambas partidas separadas, con la diferencia de que el contribuyente tributará sobre una sola de las partidas, (la que reporte ganancias) y sobre la otra, no tendrá que pagar contribución sobre ingresos, por ser una pérdida, tal y como tendría que hacerlo si rindiese dos planillas separadas.

De cualquier manera, con independencia de los defectos de los cuales pueda adolecer el Anejo G, no debemos perder de vista que éste es sólo un formulario preparado por el Departamento de Hacienda, y sus aparentes deficiencias no pueden ser impedimento para la correcta interpretación y aplicación de la ley. Es un principio establecido de hermenéutica que cuando la letra de una ley es clara, la misma no debe ser menospreciada bajo el pretexto de cumplir con su espíritu. Calderón Morales v Administración de Sistemas de Retiro, 129

---

el mismo refleja una práctica administrativa con fuerza vinculante para todos los contribuyentes acogidos a la Ley de Incentivos Industriales que utilizan el mismo. Debido a que concluimos que la ley y el reglamento justifican el tratamiento separado del IFI para fines de tributación, no es necesario resolver si el uso del anejo constituye efectivamente una práctica administrativa generalmente aceptada.

D.P.R. 1020 (1992); <u>Atlantic Pipe Corporation v. F.S.E.</u>, 132 D.P.R. 1026 (1993); <u>Cotto Guadalupe v. Departamento de Educación</u>, 138 D.P.R. 658 (1995); <u>Sist. Univ. Ana G. Méndez v. C. de E. S.</u>, Op. de 21 de febrero de 1997, 97 JTS 22.

En este caso, no cabe duda que tanto la Ley de Incentivos Industriales como el Reglamento de la Ley de Contribuciones sobre Ingresos requieren que se radique una planilla de contribuciones separada donde conste el IFI únicamente, impidiendo así que se compensen pérdidas resultadas de otras operaciones no exentas.  Para todos los efectos legales y tributarios, el IFI, si bien tributa bajo la Ley de Contribuciones sobre ingresos, es un ingreso separado y distinto de cualquier otro ingreso no exento.

Por todos estos fundamentos, procede revocar la sentencia dictada por el Tribunal de Circuito de Apelaciones y devolver el caso a dicho foro.


                        Miriam Naviera de Rodón
                        Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Qume Caribe, Inc.

  Apelado-Recurrido

    v.          CC-1997-293

Secretario de Hacienda,
Estado Libre Asociado de P.R.

  Apelante-Peticionario

SENTENCIA

San Juan, Puerto Rico, a 30 de marzo de 2001

  Por los fundamentos expuestos en la anterior Opinión, se revoca la sentencia dictada por el Tribunal de Circuito de Apelaciones y se devuelve el caso a dicho foro.

  Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.  El Juez Asociado señor Rivera Pérez disiente sin Opinión escrita.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo