ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **JUAN CARLOS ALBORS LAHONGRAIS**<br><br>Apelante<br><br>v.<br><br>**TERESITA DEL C. RIERA CARRIÓN, et als.**<br><br>Apelados | KLAN202301103 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala de **San Juan**<br><br>Civil Núm.:<br>**K DP 2012-1078**<br><br>Sobre:<br>Daños y Perjuicios |

Panel integrado por su presidente, el Juez Rivera Torres, la Jueza Rivera Pérez y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de junio de 2024.

Comparecen ante nos el señor Juan Carlos Albors Lahongrais (señor Albors Lahongrais o apelante) en solicitud de que revisemos una *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o Foro Primario).[1] En virtud del aludido dictamen, el TPI desestimó una *Demanda* de daños y perjuicios y enajenación parental y de afecto incoada por el señor Albors Lahongrais. A su vez, el Foro Primario desestimó la *Reconvención* interpuesta por la señora Teresita Del C. Riera Carrión (señora Riera Carrión o apelada), con excepción de su reclamo en daños y perjuicios por el impago de unas mensualidades hipotecarias.

Por los fundamentos que esbozaremos a continuación, se adelanta la confirmación del dictamen apelado.

-I-

El caso ante nuestra consideración dimanó el 7 de septiembre de 2012, fecha en que el señor Albors Lahongrais incoó una *Demanda*

---

[1] Apéndice de *Apelación Civil,* págs. 103-145.

sobre daños y perjuicios y enajenación parental y de afecto contra la señora Riera Carrión y sus progenitores, el matrimonio Riera-Carrión.[2] En esta, sostuvo que estuvo casado con la apelada por dieciocho (18) años hasta marzo de 2012, cuando advino final y firme la sentencia de divorcio. Arguyó que producto de dicha relación, se procrearon tres (3) hijos, quienes, al momento de instarse la acción, eran unos menores de edad que residían con la apelada. El señor Albors Lahongrais adujo ser objeto de maltrato emocional por parte de la señora Riera Carrión y sus progenitores. A saber, alegó que crearon falsas situaciones de maltrato físico para encarcelarlo; reportaron un falso secuestro de sus hijos a las autoridades para arrestarlo; influyeron maliciosamente en la *psiquis* y conciencia de sus hijos para enajenarlos de su progenitor. Además, puntualizó que lo anterior le provocó presuntas angustias mentales, graves daños emocionales, humillación, intensos sufrimientos, tristeza, miedo, preocupación continua, aprensión, miedo a la pérdida de libertad, depresión, gastos legales sustanciales para defenderse, entre otros. Por ello, peticionó una suma global de $2,100,000.00 por concepto de daños y perjuicios, entre otras partidas.

Tras varios trámites procesales, el 13 de enero de 2016, la señora Riera Carrión contestó la *Demanda*.[3] Mediante esta, negó las alegaciones del señor Albors Lahongrais y presentó una *Reconvención*. La apelada esgrimió que durante y posterior al matrimonio, el apelante la sometió a un patrón de maltrato físico y psicológico, incluyendo: maltrato verbal, agresiones ocurridas a principios de mayo de 2005 y el 18 de junio de 2008, maltrato físico y verbal contra sus hijos, amenazas, privación de la custodia de sus hijos, no ejercer las relaciones paternofiliales, acusaciones falsas de

---

[2] *Íd.*, págs. 1-3. El señor Albors Lahongrais desistió con perjuicio la reclamación contra el matrimonio Riera-Carrión.
[3] *Íd.*, págs. 42-46.

maltrato a sus hijos ante las autoridades y alienación maternal al excluirla como contacto en las solicitudes de los campamentos de veranos y de participar en una herencia de sus hijos. A su vez, alegó estrangulamiento económico por incumplir con el pago de la pensión alimentaria, gastos necesarios y la universidad de sus hijos, consignar la pensión alimentaria al tribunal cuando estaba prohibido por orden judicial y dejar de pagar la hipoteca y las cuotas de mantenimientos de la residencia de sus hijos. Por otro lado, adujo que el apelante la estranguló económicamente por incumplir con los alimentos fijados para ella, cancelarle la póliza de seguro médico, negarse a pagar sus gastos médicos, negarse a darle acceso a los fondos de la comunidad de bienes y dejar de rendir cuenta sobre los bienes gananciales. La apelada precisó que dicha conducta del señor Albors Lahongrais presuntamente le causó profundas angustias mentales, sufrimientos físicos y morales, miedos y preocupaciones. Por ello, solicitó $3,000,000.00 por daños físicos y psicológicos y $2,000,000.00 por daños económicos, entre otras partidas.

El 1 de diciembre de 2021, el TPI emitió una *Resolución*.[4] Entre otras cosas, resolvió preliminarmente que de las alegaciones de la *Demanda* del apelante y de la *Reconvención* de la apelada se desprendió que sufrieron daños continuos a raíz de las actuaciones ininterrumpidas de maltrato emocional por parte de la señora Riera Carrión como de maltrato psicológico y económico por parte del señor Albors Lahongrais durante el matrimonio hasta posterior a su disolución. No obstante, el Foro Primario estableció que era necesario desfilar prueba para determinar si, en efecto, los daños alegados por las partes eran de naturaleza continua y el momento en que comenzó a discurrir el término prescriptivo de las causas de acción. Además, el TPI estableció que la *Reconvención* de la apelada era compulsoria.

---

[4] *Íd.*, págs. 90-102.

Posteriormente, entre los días 6 de octubre de 2022 y 10 de enero de 2023, se celebró el juicio en su fondo, en el que se desfiló prueba testifical y documental. El señor Albors Lahongrais presentó su propio testimonio. Mientras, la señora Riera Carrión presentó el testimonio de la señora Marimar Pérez Riera, la señora Lourdes Riera Rodríguez, el apelante y su propio testimonio.

Escuchada y aquilatada la prueba, el 8 de septiembre de 2023, el TPI emitió y notificó una *Sentencia* en la que desestimó tanto la *Demanda* del apelante, así como la *Reconvención* de la apelada, excepto por el reclamo de la apelada en daños y perjuicios por el impago en las mensualidades de la hipoteca del apartamento.[5] El TPI concluyó que las reclamaciones realizadas tanto por el señor Albors Lahongrais como por la señora Riera Carrión sobre un patrón de maltrato físico y/o psicológico eran daños sucesivos, no continuados. Por otro lado, el Foro Primario consignó que a pesar de que la *Sentencia* de divorcio del matrimonio Albors-Riera se decretó el 22 de febrero de 2012, la doctrina de inmunidad conyugal o familiar no era aplicable a este caso desde el 18 de junio de 2008. Esto, puesto que, la *Sentencia* de divorcio formalizó lo que estaba disuelto desde el 18 de junio de 2008, fecha en que las partes se separaron y no volvieron a convivir bajo el mismo techo. Pues, en dicho día, la señora Riera Carrión le expresó al señor Albors Lahongrais que el matrimonio se había acabado, que conocía sus derechos y que, si no se marchaba del apartamento, le radicaría una Orden de Protección.

El Foro Primario resolvió que la causa de acción de persecución maliciosa del apelante estaba prescrita y por ello se debía desestimar, debido a que la *Demanda* fue presentada fuera del término prescriptivo desde que ocurrieron los cuatro (4) procedimientos judiciales de naturaleza criminal que la apelada le radicó entre junio

---

[5] Apéndice de *Apelación Civil,* págs. 103-145.

de 2008 y febrero de 2010. De igual forma, el TPI concluyó que la causa de acción de maltrato físico y psicológico de la señora Riera Carrión estaba prescrita puesto que la apelada conocía del daño y la persona que lo causó desde el momento en que ocurrieron los hechos, sin radicar una acción. Por otro lado, la señora Riera Carrión no presentó prueba a satisfacción del TPI para sostener su reclamación por la cantidad desembolsada de sus acciones en el Banco Popular u otros bienes privativos como resultado del incumplimiento del Sr. Albors Lahongrais con el pago de la pensión alimentaria y otros gastos. El TPI entendió precedía peticionar un crédito en el pleito que sostenían en la Sala de Relaciones de Familia. Asimismo, el Foro Primario razonó que las demás reclamaciones de la apelada se debían continuar litigando en los otros casos. Sin embargo, el TPI resolvió que la única reclamación de la *Reconvención* que no estaba prescrita era la relacionada a los pagos de la hipoteca del apartamento que sirvió como la residencia familiar y el hogar seguro de la apelada y sus hijos, que a la fecha de instarse la *Demanda* de autos, la deuda ascendía a $500,000.00. Esto, al comprender que el señor Albors Lahongrais, a sabiendas y con conocimiento de sus posibles consecuencias, incumplió con los pagos de la hipoteca en los años 2015 y 2018. El TPI estableció que, a pesar de que las partes llegaron a acuerdos sobre la deuda en un caso que se está dilucidando en la Sala de Relaciones de Familia, el aspecto económico ha sido utilizado tanto por el señor Albors Lahongrais como por la señora Riera Carrión como un elemento de opresión hacia la parte contraria. El Foro Primario concluyó que la reclamación de la apelada por el incumplimiento del señor Albors Lahongrais con el pago de la hipoteca era legítima y que la conducta del apelante le causó angustias mentales, daños morales y un posible daño a su crédito por ser codeudora de la obligación y codueña del inmueble hipotecado. Por esto, el TPI condenó al apelante a compensar a la señora Riera

Carrión por la suma de $25,000.00 por daños morales y angustias mentales y $5,000.00 por el daño a su crédito. Para ello, el TPI realizó las siguientes determinaciones de hechos probados:

1. El Sr. Juan Carlos Albors y la Sra. Teresita Riera Carrión contrajeron matrimonio el 19 de noviembre de 1994, en San Juan, Puerto Rico.
2. Durante el matrimonio, procrearon tres hijos [...]
3. El 18 de junio de 2008, hubo un altercado entre las partes que provocó que la Policía de Puerto Rico se personara en la residencia del matrimonio Albors-Riera y que la Sra. Riera solicitara ante el Tribunal una Orden de Protección contra el Sr. Albors.
4. Según la declaración de la Sra. Riera, creída por este Tribunal, ese día el Sr. Albors la invitó a ir al cine ubicado en el centro comercial San Patricio Plaza, pues él debía recoger unos medicamentos en la farmacia Walgreens de ese lugar. El Sr. Albors también le dijo que estacionara su vehículo en el área aledaña al antiguo parque de diversiones que allí operaba y había sido demolido.
5. A la Sra. Riera le pareció extraño que él tuviera que recoger los medicamentos en la referida farmacia, pues el récord de ambos estaba en la farmacia del Condado, cerca de la vivienda del matrimonio.
6. También le resultó extraña la invitación al cine, pues en ese momento su matrimonio no estaba en una situación estable, tenían muchas discusiones y según dijo, el Sr. Albors tenía una relación extramarital con su secretaria.
7. El lugar donde el Sr. Albors le indicó que estacionara levantó suspicacias en la Sra. Riera, pues era un área distante de la entrada al centro comercial, habían escombros y tenía poca o ninguna iluminación.
8. Ese día, 18 de junio de 2008, ocurrieron otros eventos que a la Sra. Riera también le parecieron extraños, como su intento fallido de pagar el almuerzo con la tarjeta American Express, pues fue declinada aun cuando la línea de crédito era ilimitada; recibió una llamada del Banco Popular relacionada con llamadas recibidas a ese institución de personas que no pudieron contestar las preguntas de seguridad de sus cuentas en esa institución; y sus intentos para comunicarse por teléfono con el Sr. Albors resultaron infructuosos.
9. Estando en el vehículo con su prima Marimar Pérez Riera (Marimar), quien también fue testigo, la Sra. Riera recibió la llamada del Sr. Albors sobre la invitación al cine. Según la apreciación de la Sra. Riera y su prima, la voz del Sr. Albors sonaba extraña, ronca, como tratando de persuadirla de una manera que a Marimar le pareció "perversa".
10. En lugar de acudir a San Patricio Plaza, la Sra. Riera se dirigió al apartamento de su prima, quien vive en el edificio que está frente al condominio [...] donde vivía el matrimonio Albors-Riera. En el apartamento también estuvo su tía, la Sra. Lourdes Riera Pérez, madre de Marimar, quien pudo apreciar el estado

anímico de la Sra. Riera y presenciar lo que ocurrió después entre ella y el Sr. Albors.

11. Según lo declarado por la Sra. Pérez Riera, Teresita (Sra. Riera) estaba en un estado de nervios terrible como resultado de lo ocurrido con la tarjeta de crédito, las llamadas no contestadas al Sr. Albors y la reacción que le produjo su invitación para ir al cine esa noche.

12. Estando las tres en el apartamento, el Sr. Albors llamó a la Sra. Riera a su teléfono de forma insistente; también llamó al teléfono de Marimar. La Sra. Riera contestó y le dijo que estaba en el apartamento de su prima.

13. La Sra. Pérez Riera escuchó la llamada que contestó la Sra. Riera, pues estaba en el altavoz. También escuchó cuando él le pidió a la Sra. Riera que se asomara por la ventana, pues los hijos querían verla.

14. El. Sr. Albors llegó hasta el condominio donde vive Marimar y a través del *intercom* dijo que quería subir al apartamento de esta.

15. La Sra. Riera salió por las escaleras de emergencia junto a su tía para dirigirse a su apartamento. Llegó a su residencia acompañada de su tía, de su madre Marilyn Carrión, quien reside en el mismo condominio, y del guardia de seguridad del condominio.

16. El Sr. Albors llegó al apartamento del matrimonio y le pidió a la Sra. Carrión y a la Sra. Pérez Riera que se fueran; al guardia de seguridad le prohibió que estuviera allí.

17. La Sra. Riera llevó a sus hijos a un cuarto y les instruyó que no salieran. Luego, se dirigió al Sr. Albors y le dijo que su matrimonio había terminado, que conocía cuáles eran sus derechos; que se fuera del apartamento a la propiedad que está en Dorado; que si no se iba, solicitaría una Orden de Protección.

18. Previo a la llegada del Sr. Albors al apartamento y a que ocurriera el enfrentamiento entre ambos, la Sra. Riera se había comunicado con un abogado y una fiscal, y anotó en un papel las palabras que le diría al Sr. Albors.

19. La Sra. Pérez Riera presenció cuando la Demandada-Reconveniente le pidió al Sr. Albors que se fuera de la casa y corroboró la versión de la Sra. Riera en el sentido de que hubo un forcejeo con el Sr. Albors cuando ella (Sra. Riera) se aferró al borde de la puerta y el Sr. Albors la tomó por la parte superior de los brazos, halándola. También corroboró el estado exacerbado, alterado y molesto del Sr. Albors, pues declaró haber escuchado que la llamó embustera y loca, lo vio alterado, gritando, molesto y en una actitud que describió "como un león".

20. Mientras esto ocurría, sonó el *intercom* del apartamento y el guardia de seguridad anunció que había llegado la Policía. El Sr. Albors fue llevado ante la Sala de Investigaciones y la Sra. Riera trasladada en una patrulla a la Fiscalía de San Juan.

21. El Sr. Albors se sintió avergonzado y humillado al ser llevado por agentes de la Policía en una patrulla hasta el Centro Judicial de San Juan, donde estuvo bajo

custodia durante varias horas en una de las celdas del tribunal.

22. Contra el Sr. Albors se presentó una denuncia el 19 de junio de 2008, bajo el Artículo 3.1 de la Ley Núm. 54-1989, según enmendada (*Ley para la Prevención e Intervención con la Violencia Doméstica*). Mientras, la Sala de Investigaciones expidió a favor de la Sra. Riera una Orden de Protección *Ex Parte*, quedando citado el Sr. Albors para el 24 de junio de 2008.

23. A la vista del 24 de junio, las partes comparecieron representadas por abogado[s]. La Sra. Riera solicitó el archivo de su petición toda vez que las partes habían llegado a unos acuerdos.

24. Los acuerdos incluían relaciones paterno-filiales, custodia, pensión alimentaria, tratamiento psicológico para los menores y el archivo de la petición para una Orden de Protección.

25. Los acuerdos fueron examinados y aprobados por el Tribunal, quedando recogidos en una *Resolución* al amparo de la Ley 140 sobre Estados Provisionales de Derecho.

26. El Tribunal determinó No Causa en cuanto a la denuncia bajo el Art. 3.1 de la Ley de Violencia Doméstica, presentada contra el Sr. Albors.

27. El 18 de julio de 2008, la Sra. Riera presentó Demanda de Divorcio contra el Sr. Albors por la causal de trato cruel, caso K DI2008-1277.

28. El 3 de septiembre de 2008, la Sala de Relaciones de Familia estableció una pensión alimentaria provisional de $13,150.00 mensuales, pagadera por el Sr. Albors. La Sra. Riera se encargaría de hacer los pagos de hipoteca y cuotas de mantenimiento, luz, agua, teléfono y otros gastos. El Sr. Albors pagaría, además, los gastos de la educación de los hijos y continuaría pagando la cubierta familiar del plan médico para los menores y para la Sra. Riera.

29. Dicha pensión se mantuvo en enero [de] 2009. No obstante, en mayo de ese año, la Sra. Riera solicitó un ajuste al no recibir el pago de dividendos por sus acciones.

30. El fin de semana del 3 al 5 de julio de 2009, el Sr. Albors ejercería relaciones paterno filiales con sus hijos, por lo que fue a la residencia de la Sra. Riera para recogerlos. El único de los menores que aceptó irse con su padre fue [el del medio].

31. La Sra. Riera declaró que habían acordado que el menor regresaría al día siguiente, sin embargo, eso no ocurrió.

32. Durante el fin de semana, la Sra. Riera trató de comunicarse con el Sr. Albors y con su hijo por teléfono, pero las llamadas no fueron contestadas.

33. La falta de comunicación con su hijo hizo que la Sra. Riera se sintiera ansiosa, asustada y preocupada.

34. A juicio de la Sra. Riera, la determinación del tribunal vigente entonces establecía que luego de las relaciones paterno-filiales en fin de semana, los menores debían ser devueltos al hogar de su madre el domingo, a las 7:00 p.m.

35. El Sr. Albors no entregó al menor el domingo, 5 de julio de 2009, pero la Sra. Riera recibió un mensaje del Sr. Albors informando que estaba fuera de Puerto

Rico y que regresarían durante la semana. Al día siguiente, recibió otro mensaje de texto indicando que el menor estaba bien.

36. Ante la falta de comunicación con el Sr. Albors y su hijo, y la información de que estaban fuera de la jurisdicción, la Sra. Riera decidió acudir a la Policía.

37. Consultado el caso con el Fiscal César Mercado Santaella, el 6 de julio de 2009 se presentó una denuncia contra el Sr. Albors bajo el Artículo 135 (a) del Código Penal, en 4to. Grado, por haber sacado al menor fuera de la jurisdicción sin autorización de la madre.

38. Con motivo de esta denuncia, el Sr. Albors fue arrestado y esposado a su llegada al aeropuerto internacional Luis Muñoz Marín, ante la vista de su hijo y de otras personas que allí estaban.

39. El Sr. Albors declaró sentirse humillado, apenado, adolorido, ultrajado y decepcionado pues, según declaró, estaba autorizado por el tribunal a viajar con su hijo fuera de la jurisdicción.

40. La determinación del tribunal en cuanto a la denuncia fue de *No Causa*.

41. La prueba estableció que el Sr. Albors había notificado al Tribunal sobre un itinerario de viaje a California, que no fue el que hizo con el menor [...] ese fin de semana.

42. El Sr. Albors admitió no haber presentado Moción alguna para informar sobre el viaje que realizó junto a su hijo ese fin de semana a Disney World en Orlando, Florida.

43. La *Resolución* de la Hon. Laura Ivette Ortiz Flores, Jueza Superior, de mayo de 2009 (caso K DI2008-1277), que para entonces reglamentaba las relaciones paterno filiales, establece que el padre viajaría ese verano con los menores durante un periodo de dos semanas o 14 días, las últimas dos semanas de junio y la primera de julio. A su vez, establece que durante el periodo en que el padre ejerza las relaciones paterno-filiales, facilitará la comunicación diaria con la madre, acordando ambas partes que la comunicación sería a las 8:00 p.m.

44. En julio de 2009, la Sra. Riera solicitó una Orden de Protección contra el Sr. Albors. Según surge de la evidencia presentada, la peticionaria declaró bajo juramento que el Sr. Albors la llamó "loca", se personó al lugar donde ella vive y amenazó con quitarle los hijos y recibe llamadas con palabras soeces.

45. La Orden de Protección fue emitida *Ex Parte* por la Hon. Yazdel Ramos y extendida del 4 de agosto hasta el 21 de agosto de 2009, por la Hon. Vanessa Pintado Rodríguez. Luego de citarse al Sr. Albors, el Hon. José M. Anglada Raffucci determinó no expedir [la] Orden de Protección Final.

46. El 12 de febrero de 2010, la Sra. Riera recibió una llamada de la escuela de los menores [...], indicándole que [uno de los menores] no quería irse con su padre. La Sra. Riera acudió entonces a la escuela para recoger a su hijo. El Sr. Albors tomó [al menor] por el brazo y le insistía en que se fuera con él, mientras el menor le decía, de manera suplicante, que no, que lo dejara ir.

47. El incidente ocurrió frente a la testigo Marimar Pérez Riera, otras personas y personal de la escuela que estaban en el lugar, algunas de las cuales conocen tanto al Sr. Albors como a la Sra. Riera por ser ambos exalumnos de la institución y personas con quienes la Sra. Riera trabajó allí.

48. Como consecuencia de lo ocurrido, la Sra. Riera declaró sentirse indignada y avergonzada.

49. La Sra. Riera acudió a la Policía para presentar una Petición de Orden de Protección; luego acudió a la Sala de Investigaciones del Tribunal en San Juan.

50. La querella no prosperó; no llegó a dilucidarse ante un Juez porque la Sra. Riera decidió marcharse.

51. Según su testimonio en corte, creído por este Tribunal, la Sra. Riera decidió marcharse luego de esperar hasta las 11:00 p.m. y conocer que el agente que le había instruido llegar al tribunal para que lo esperara allí había terminado su turno, por lo cual entendió que no se presentaría para ver el caso. Además, sus hijos le estaban esperando junto a un familiar.

52. El. Sr. Albors ha pagado la educación de sus hijos en universidades en Estados Unidos, aunque no necesariamente todos los gastos que tales estudios implican. En cuanto a los estudios doctorales de uno de sus hijos [...], le da una cantidad mensual ($2,000.00) para sus gastos personales.

53. Entre los gastos que el Sr. Albors debía sufragar según las órdenes emitidas por la Sala de Relaciones de Familia bajo el K DI2008-1277, está el plan médico de la Sra. Riera. La falta de pago del plan médico previo al año 2011, en un momento en que la Sra. Riera enfrentaba una situación de salud que le requirió recibir tratamiento fuera de Puerto Rico, conllevó que la Demandada tuviera que hacer un desembolso de $35,000.00, aproximadamente.

54. El Sr. Albors es Presidente y Tesorero de Albors Construction. Esta entidad no tiene Junta de Directores ni nómina.

55. Albors Construction adquirió una embarcación a un costo de $365,000.00, más $20,000.00 de arbitrios y otras cantidades por otros conceptos.

56. En o alrededor del año 2011, mientras el Sr. Albors se encontraba con uno de sus hijos en la embarcación, hubo un accidente que la dejó a la deriva.

57. La Sra. Riera fue contactada por la Guardia Costanera, quien en ese momento sintió temor de que su hijo hubiera sufrido daños y hasta perdido la vida como consecuencia del accidente.

58. El 22 de febrero de 2012, se dictó la Sentencia de Divorcio entre las partes por la causal de Separación. En la Sentencia, se hacen determinaciones sobre Custodia, Pensión alimentaria y Relaciones paterno-filiales.

59. Mientras se dilucidaba el litigio por el divorcio, la Sala de Relaciones de Familia atendió y dilucidó múltiples reclamaciones en torno a la pensión *pendente lite* y otros gastos, relaciones paterno y materno-filiales, tratamiento psicológico para los menores y la

coadministración de la sociedad legal de gananciales, entre otros asuntos.

60. En la Resolución emitida el 3 de febrero de 2012 en el caso K DI2008-1277, mediante la cual se estableció una pensión *pendente lite* y se fijaron *litis expensas*, la Sala de Relaciones de Familia determinó, como cuestión de hecho, que la Sra. Riera no participa, en forma alguna, en las decisiones y funciones de las corporaciones en que la sociedad legal de gananciales tuvo o tiene algún interés económico; tampoco recibe ingresos ni ganancias que se generen de su operación. Tampoco figura su firma como autorizada en las cuentas pertenecientes a la sociedad legal de gananciales.

61. La referida *Resolución* ordenó la coadministración de todos los bienes pertenecientes a la sociedad legal de gananciales, para lo cual el tribunal dispuso varias alternativas, entre las cuales figura la designación de un Administrador para los bienes de la sociedad legal de gananciales, en caso de que las partes no llegaran a un acuerdo sobre la manera de administrarlos o sobre un tercero seleccionado por ambos para así hacerlo.

62. En los pasados años, la Sra. Riera radicó dos (2) pleitos relacionados, entre otras cosas, a la coadministración de los bienes, a saber: K AC2009-0199 y D AC2016-1075. El primer pleito fue desestimado y el segundo fue desistido.

63. Desde que se separaron, la Sra. Riera no ha tenido acceso a los fondos o bienes de la sociedad legal de gananciales. Tampoco ha recibido pago por concepto de dividendos de las corporaciones en que la sociedad legal de gananciales tiene intereses económicos.

64. Según su testimonio en corte, tuvo que utilizar dinero de sus acciones en el Banco Popular, cuyo valor se redujo sustancialmente en el año 2008, para sufragar gastos de la casa y de sus hijos, debido a los atrasos del Sr. Albors en el pago de la pensión alimentaria y aunque se acordó que le serían reembolsados, no ha recibido la totalidad adeudada.

65. Para la Sra. Riera, las acciones del Banco Popular era el activo principal con que contaba para su retiro; también, deseaba transmitirlas a sus hijos como parte del patrimonio de su familia.

66. Mediante *Resolución* dictada el 13 de abril de 2015, en que se atiende la solicitud de custodia compartida presentada por el Sr. Albors, el Tribunal (Hon. Ladi Buono De Jesús) determinó que:

> De la prueba presentada y creída por el tribunal, no surge que la parte demandada [Sr. Albors] haya incurrido en negligencia ni maltrato en contra de los menores. Tampoco surge que el [Sr. Albors] haya incurrido en conducta constitutiva de violencia doméstica en contra de la parte demandante [Sra. Riera].

67. En una vista celebrada el 25 de agosto de 2010 ante la Sala de Relaciones de Familia bajo el caso K DI2008-1277, las partes estipularon que a partir de noviembre 2010, el Sr. Albors retendría el dinero de la hipoteca para pagarla y entregaría la diferencia de

la pensión, fijada entonces en $14,650.00, a la Sra. Riera.

68. El Sr. Albors se atrasaba con frecuencia en el pago de la pensión y otros gastos fijados por el Tribunal, lo cual obligaba a la Sra. Riera a presentar mociones requiriendo su cumplimiento.

69. Los pagos de la hipoteca del apartamento en el Condominio [...] que constituía el hogar seguro de los menores y de la Sra. Riera fue asumido por el Sr. Albors desde noviembre 2010 [...] Los pagos de la hipoteca se atrasaron durante varios meses en más de una ocasión, lo que motivó la presentación de dos (2) casos sobre ejecución de hipoteca, a saber: K CD2015-2259 y SJ2019CV09207. El primero de ellos fue desistido por el acreedor al recibir los pagos en atraso; el segundo no ha recibido una disposición en sus méritos.

70. El atraso en los pagos de la pensión alimentaria conllevó atrasos en el pago de las cuotas de mantenimiento y los servicios de luz y agua, entre otros. Según lo declarado por la Sra. Riera, esto tuvo como consecuencia que se le suspendieran dichos servicios esenciales, además de que ello fuera de conocimiento de los vecinos y miembros de la Junta de Directores del Condominio, por lo que se sintió humillada y avergonzada públicamente.

71. Expresó, además, que constantemente ha tenido que solicitar ayuda económica a sus padres.

72. Tomamos conocimiento judicial de que en el caso K DI2008-1277, se continúan litigando controversias relacionadas con el pago de la pensión alimentaria y otros gastos fijados por el Tribunal, incluyendo acuerdos sobre el proceso de ejecución de hipoteca del apartamento [...] Bajo ese caso, las partes mantienen también disputas sobre alegados pagos adeudados y reembolsos por estos conceptos, así como por el alegado incumplimiento recíproco de órdenes emitidas en torno a los asuntos pendientes, entre otras reclamaciones.

No conforme, el 22 de septiembre de 2023, el señor Albors Lahongrais presentó una *Moción de reconsideración*.[6] Con relación a la concesión de daños por el impago de la hipoteca, planteó que la señora Riera Carrión se autoinfligió el daño dado que, previo a instarse la segunda demanda de cobro de dinero, el señor Albors Lahongrais logró un acuerdo con el acreedor en el procedimiento de mitigación de pérdidas, pero se malogró dado que la apelada se negó a firmarlo. Además, adujo que no existe una causa de acción de daños mentales y morales por el impago de una hipoteca, más que en este

---

[6] *Íd.*, págs. 146-169.

caso no se desfiló prueba sobre las angustias mentales ni se presentó un informe de crédito para establecer que a la señora Riera Carrión se le afectó el crédito. A modo persuasivo, el apelante arguyó que un Panel Hermano de esta Curia apelativa resolvió en *Pagán Feliciano v. Oriental Bank*, KLAN201800935, que una persona cuyo crédito se afectó conoce del daño mediante el informe de crédito y desde dicha fecha posee un año para instar una acción extracontractual. A su vez, esgrimió que en el Foro Primario no se presentó prueba sobre que la afectación del crédito de la señora Riera Carrión se debió al pago de la hipoteca. Entre otras cosas, el señor Albors Lahongrais peticionó que el TPI emitiera determinaciones de hechos y derecho adicionales.

Por su parte, el 25 de septiembre de 2023, la señora Riera Carrión presentó una *Moción solicitando reconsideración*.[7] En esta, solicitó que se le adjudicara temeridad al señor Albors Lahongrais y que se le impusiera una partida por los honorarios de abogados, a tenor con la Regla 44 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.

Tras varios trámites procesales, el 9 de noviembre de 2023, el TPI emitió una *Resolución* en la que declaró No Ha Lugar a las solicitudes de reconvención presentadas por ambas partes.[8]

Insatisfecho con el dictamen del TPI, el señor Albors Lahongrais acudió ante nos mediante el recurso de apelación que nos ocupa, en el que le atribuyó al TPI la comisión de los siguientes errores:

> **PRIMER ERROR:** ERRÓ EL TPI, SALA DE SAN JUAN POR VOZ DE LA HONORABLE JUEZA AIDA ILEANA OQUENDO GRA[U]LAU, AL DETERMINAR QUE LA CAUSA DE ACCIÓN, A MANERA DE RECONVENCIÓN, INSTADA POR LA SRA. RIERA NO ESTABA PRESCRITA EN AQUELLAS ALEGACIONES DE DAÑOS QUE AFECTARON EL CRÉDITO Y DETERMINAR, ADEMÁS, QUE LA PRUEBA DESFILADA HABÍA ENMENDADO LAS ALEGACIONES Y CREADO UNA CAUSA DE ACCIÓN DE DAÑOS POR LA FALTA DE PAGO DE LA HIPOTECA DE LA PROPIEDAD GANANCIAL UTILIZADA COMO VIVIENDA Y OCUPADA POR LA SRA. RIERA ERA UNA COMPULSORIA CUANDO REALMENTE ERA UNA

---

[7] *Íd.*, págs. 170-176.
[8] *Íd.*, págs. 202-203. Archivada y notificada el 10 de noviembre de 2023.

PERMISIBLE CON EL EFECTO JURÍDICO DE QUE ESTABA PRESCRITA EN SU TOTALIDAD.

**SEGUNDO ERROR:** ERRÓ EL TPI, SALA DE SAN JUAN POR VOZ DE LA HONORABLE JUEZA AIDA ILEANA OQUENDO GRA[U]LAU, AL REALIZAR DETERMINACIONES DE HECHOS EN SUS MÉRITOS CUANDO YA HABÍA DETERMINADO QUE TALES CAUSAS DE ACCIÓN ESTABAN PRESCRITAS.

**TERCER ERROR:** ERRÓ EL TPI, SALA DE SAN JUAN POR VOZ DE LA HONORABLE JUEZA AIDA ILEANA OQUENDO GRA[U]LAU, AL COMPENSAR ECONÓMICAMENTE A LA SRA. RIERA POR LA ALEGADA FALTA DE PAGO DE LA HIPOTECA POR VARIAS RAZONES, A SABER:

a. EL TPI DETERMINÓ QUE EL PAGO DE LA HIPOTECA ERA PARTE DE LA PENSIÓN ALIMENTARIA, POR LO QUE LA SRA. RIERA REPRESENTABA A LOS HIJOS MENORES ANTE LA SALA DE RELACIONES DE FAMILIA Y MEDIANTE LA FIGURA DEL DESACATO PUDO HABER SOLICITADO LA CORRECCIÓN DE TAL ALEGADA ANOMALÍA A NOMBRE Y EN REPRESENTACIÓN DE LOS MENORES.

b. LA APELADA SENTENCIA RESULTA CONFUSA Y CONTRADICTORIA, YA QUE AL TPI SEÑALAR EN LA MISMA QUE LOS ASUNTOS RELACIONADOS CON LA FALTA DE PAGO DE LA HIPOTECA DEBÍAN SER DILUCIDADOS ANTE LA SALA DE RELACIONES DE FAMILIA EN EL CASO IDENTIFICADO COMO K DI2008-1277, SIN EMBARGO DETERMINÓ QUE LA PRUEBA HABÍA ENMENDADO LAS ALEGACIONES Y DECIDIÓ COMPENSAR ECONÓMICAMENTE EN DAÑOS A LA SRA. RIERA POR ALEGADA FALTA DE PAGO DE LA HIPOTECA.

c. DE DETERMINARSE LA EXISTENCIA DE UNA CAUSA DE ACCIÓN EN DAÑOS POR LA ALEGADA FALTA DE PAGO DE LA HIPOTECA, ERRÓ EL TPI AL COMPENSARLO PORQUE LA SRA. RIERA SE AUTOINFLIGIÓ EL DAÑO POR SUS ACTOS, CONDUCTA Y FALTA DE CREDIBILIDAD.

**CUARTO ERROR:** ERRÓ EL TPI, SALA DE SAN JUAN POR VOZ DE LA HONORABLE JUEZA AIDA OQUENDO GRA[U]LAU, AL DETERMINAR Y COMPENSAR EN LA CANTIDAD DE $5,000.00 A LA SRA. RIERA POR LA ALEGADA AFECTACIÓN DE SU CRÉDITO POR LA FALTA DE PAGO DE LA HIPOTECA DEL HOGAR DONDE RESIDE, BIEN INMUEBLE QUE FORMA PARTE DE LA MASA GANANCIAL SUJETA A PARTICIÓN QUE SE LITIGA EN EL CASO SJ2021CV03041. LA PRUEBA DESFILADA NO DEMOSTRÓ QUE LA ALEGADA AFECTACIÓN DEL CRÉDITO HAYA SIDO POR CAUSA DE LA FALTA DE PAGO DE LA HIPOTECA, ADEMÁS QUE COMO CUESTIÓN DE DERECHO LA PRUEBA DESFILADA FUE INSUFICIENTE.

En atención a los errores planteados por el apelante, procedemos a exponer la normativa jurídica atinente a este recurso.

## II.

### A. <u>Apreciación de la prueba</u>

En nuestro ordenamiento jurídico, los foros apelativos debemos brindar deferencia a las determinaciones de hechos formuladas por el tribunal de instancia. *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 740 (2007). Esta deferencia yace en que el Foro Primario está en mejor posición que un tribunal apelativo para realizar la determinación de credibilidad. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Se le impone un respeto a la labor del tribunal de instancia en aquilatar la credibilidad, puesto que los foros apelativos sólo poseemos récords mudos e inexpresivos. *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009); *Pérez Cruz v. Hospital La Concepción*, 115 DPR 721, 728 (1984). Pues, en gran medida, la determinación de credibilidad depende de observar la manera en que la persona testigo declara, apreciar sus gestos, titubeos, contradicciones, entre otros factores que van formando gradualmente la convicción en cuanto a la verdad en la conciencia de la persona juzgadora. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67-68 (2009). Cónsono con lo anterior, la Regla 42.2 de Procedimiento Civil, *supra*, R. 42.2 dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos".

De esta forma, en ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad ni las determinaciones de hechos efectuadas por el foro primario. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022); *Sucn. Pagán Berrios v. UPR y otros*, 206 DPR 317, 336 (2021); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

Se incurre en prejuicio, parcialidad o pasión, cuando la persona juzgadora actúa motivada "por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Además, "el error manifiesto ocurre cuando el foro apelativo queda convencido de que se cometió un error, a pesar de que haya evidencia que sostenga las conclusiones de hecho del tribunal, porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Ortiz Ortiz v. Medtronic, supra*, pág. 779. De otra forma, únicamente se alterará el dictamen del tribunal de instancia en una circunstancia de error manifiesto cuando, de un examen detenido de toda la prueba, el foro apelativo esté convencido que la persona juzgadora descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios de escaso valor o inherentemente improbables o increíbles. *C. Brewer PR, Inc. v. Rodríguez*, 100 DPR 826, 830 (1972). Por ello, nuestra facultad para sustituir el criterio del foro primario está limitada a las instancias en las que, a la luz de la prueba admitida, no existe base suficiente para apoyar su determinación. *Ortiz Ortiz v. Medtronic, supra.*

Por otro lado, los tribunales apelativos nos encontramos en la misma posición del foro primario para evaluar la prueba documental o pericial que fundamentan las determinaciones de hecho. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 918 (2016); *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

### B. Doctrina de la ley del caso

Es norma reiterada que los derechos y las obligaciones previamente adjudicados por un tribunal mediante un dictamen judicial que advino final y firme constituyen la ley del caso. *Berkan et*

*al. v. Mead Johnson Nutrition*, 204 DPR 183, 200 (2020); *Cacho Pérez v. Hatton Gotay y otros*, 195 DPR 1, 8 (2016); *Mgmt. Adm. Servs. Corp. v. Fraya*, S.E., 152 DPR 599, 606 (2000). Es decir, dichos planteamientos que han sido objeto de adjudicación no pueden reexaminarse, puesto que gozan de las características de finalidad y firmeza. *Mgmt. Adm. Servs. Corp. v. Fraya*, S.E., *supra*, pág. 607. Esto, con el objetivo de promover la estabilidad y certeza del derecho. *Berkan et al. v. Mead Johnson Nutrition, supra*, pág. 201. Además, permite que las partes litigantes conduzcan su proceder en el pleito sobre unas directrices judiciales confiables y certeras. *Mgmt. Adm. Servs. Corp. v. Fraya*, S.E., *supra*, págs. 607-608. Por otro lado, propicia que las adjudicaciones tengan su fin. *Srio. del Trabajo v. Tribunal Superior*, 95 DPR 136, 141 (1967).

Ahora bien, la determinación judicial que constituye la ley del caso incluye aquellas cuestiones finales que el tribunal consideró y decidió. *Cacho Pérez v. Hatton Gotay y otros, supra*, pág. 9. Por ello, esta doctrina sólo puede invocarse cuando exista una decisión final sobre una controversia en sus méritos. *Íd.*

Vale destacar que la ley del caso no es un mandato inflexible. *Íd.* Pues, "[s]e trata de una doctrina al servicio de la justicia, no la injusticia; no es férrea ni de aplicación absoluta." *Íd.* Al efecto, excepcionalmente, si el tribunal tiene nuevamente ante su consideración un caso que entiende que sus determinaciones previas son erróneas y causan gran injusticia, puede aplicar una norma de derecho distinta. *Íd.*; *Félix v. Las Haciendas*, 165 DPR 832, 844 (2005). No obstante, solamente se puede descartar la aplicabilidad de la doctrina de la ley del caso cuando se atente contra los principios básicos de justicia. *Cacho Pérez v. Hatton Gotay y otros, supra*.

### C. **Enmienda a las alegaciones por la prueba**

Es sabido que las alegaciones además de enmendarse expresamente a través de la presentación de un escrito, asimismo se

pueden enmendar tácitamente por virtud de la prueba que se presente en juicio. R. Hernández Colón, *Práctica jurídica de Puerto Rico: Derecho procesal civil*, 6ta. ed., San Juan, Ed. Lexisnexis de Puerto Rico, 2017, pág. 298. Esto, cuando mediante consentimiento expreso o implícito las partes someten a juicio cuestiones no suscitadas en las alegaciones. *Íd.* En tal sentido, la Regla 13.2 de Procedimiento Civil, *supra*, R. 13.2, permite que las alegaciones se enmienden para conformarlas a la prueba. *Reyes Castillo v. Cantera Ramos, Inc.*, 139 DPR 925, 938 (1996); *Parrilla García v. AFF*, 92 DPR 168, 176 (1965). A saber, la referida regla dispone lo siguiente:

> **Cuando con el consentimiento expreso o implícito de las partes se sometan a juicio cuestiones no suscitadas en las alegaciones, aquéllas se considerarán para todos los efectos como si se hubieran suscitado en las alegaciones.** La enmienda a las alegaciones que sea necesaria para conformarlas a la evidencia, a los efectos de que las alegaciones reflejen las cuestiones suscitadas, podrá hacerse mediante una moción de cualquiera de las partes en cualquier momento, aun después de dictarse sentencia, pero la omisión de enmendar no afectará el resultado del juicio en relación con tales cuestiones. Si se objeta la evidencia en el juicio por el fundamento de ser ajena a las cuestiones suscitadas en las alegaciones, el tribunal podrá permitir las enmiendas, siempre que con ello se facilite la presentación del caso y la parte que presente la enmienda demuestre justa causa por la cual no pudo presentar la enmienda en el momento oportuno del proceso y que la admisión de tal prueba no perjudicará la reclamación o defensa de la otra parte. Al resolver la moción, el tribunal tomará en consideración el efecto de la enmienda sobre el resultado del caso y el perjuicio que le causa a la parte que se opone a la suspensión o continuación de la vista. [...] Regla 13.2 de Procedimiento Civil, *supra*, R. 13.2. (Énfasis nuestro).

Importante es que si la parte contraria no objeta la prueba que se encuentra fuera de las alegaciones, se entiende que las cuestiones no suscitadas en las alegaciones se sometieron al tribunal con el consentimiento implícito de las partes. R. Hernández Colón, *op. cit.* Quedando así la demanda enmendada por la prueba que se presentó en el juicio, dichas alegaciones deben ser consideradas y resueltas por el tribunal. *Íd.* Sin embargo, si la parte objeta la evidencia por ser ajena a las cuestiones suscitadas en las alegaciones, el tribunal podrá

permitir que se enmienden si facilita el caso y la parte promovente demuestra justa causa por la cual no presentó la enmienda con anterioridad y que su admisión no perjudicaría la reclamación o defensa de la parte contraria. *Íd.* En tal ejercicio, el tribunal no deberá conceder la enmienda de forma liberal, sin considerar el efecto que tiene sobre el resultado del caso y el perjuicio causado a la parte oponente. J. A. Cuevas Segarra, *Tratado de derecho procesal civil*, 2da. ed., T. II, San Juan, Ed. Publicaciones JTS, 2011, pág. 607.

Ahora bien, esta enmienda tácita de las alegaciones es permisible solo cuando se formulan nuevas alegaciones durante el juicio o en la vista en su fondo, pero no es permisible cuando los hechos y las controversias se evalúan y adjudican sumariamente. *Mayagüez Hilton Corp. v. Betancourt*, 156 DPR 234, 257 (2002).

### D. **Prescripción**

La prescripción es una defensa afirmativa que dispone que un derecho se extingue por la inercia de ejercerlo durante el periodo de tiempo determinado. *Fraguada Bonilla v. Hosp. Aux. Mutuo*, 186 DPR 365, 372-373 (2012). Por ello, el objetivo de esta figura es castigar la inercia y promover que las reclamaciones se insten oportuna y diligentemente, fomentando así la estabilidad en las relaciones jurídicas y la seguridad en el tráfico jurídico. *Íd.*, pág. 373; *Maldonado Rivera v. Suárez y otros*, 195 DPR 182, 192 (2016); *COSSEC et al. v. González López et al.*, 179 DPR 793, 806 (2010); *Culebra Enterprises Corp v. ELA*, 127 DPR 943, 950 (1991). Esto, dado que una reclamación válida se debe ejercitar oportunamente, más una persona no debe estar sujeta de forma indefinida a la contingencia de una reclamación. *Maldonado Rivera v. Suárez y otros, supra.* La prescripción extintiva aplica con el mero paso del tiempo, excepto que ocurra alguno de los supuestos previstos en nuestro ordenamiento jurídico para interrumpir. *Fraguada Bonilla v. Hosp. Aux. Mutuo, supra*, pág. 373. El término prescriptivo se interrumpe mediante la

acción judicial, la reclamación extrajudicial o el reconocimiento de la deuda por parte del deudor. Art. 1873 del Código Civil de 1930, 31 LPRA sec. 5303.[9] En lo pertinente, el Artículo 1868 del Código Civil de 1930, *supra*, 5298, dispone que el término prescriptivo para entablar una acción extracontractual al amparo del Artículo 1802 del Código Civil, *supra*, sec. 5141, es de un (1) año desde que lo supo la persona agraviada. Ahora bien, como defensa afirmativa, la prescripción debe plantearse expresa y oportunamente, ya que, de lo contrario, se entiende tácitamente renunciada. *Maldonado Rivera v. Suárez y otros*, *supra*, pág. 193; *Álamo v. Supermercado Grande, Inc.*, 158 DPR 92, 104 (2002); *Qume Caribe, Inc. v. Srio. de Hacienda*, 153 DPR 700, 712 (2001).

Como parte de la doctrina sobre la prescripción extintiva, se ha reconocido la teoría cognoscitiva del daño. *COSSEC et al. v. González López et al.*, *supra*. A tenor con dicha teoría, el término prescriptivo comienza a transcurrir desde que la parte perjudicada conoció o debió conocer que sufrió un daño, quién lo causó, así como los elementos necesarios para ejercitar efectivamente su causa de acción. *Íd.*; *Maldonado Rivera v. Suárez y otros*, *supra*, pág. 194.

### E. Daños sucesivos y daños continuados

Entre las categorías de los daños, se encuentran los daños sucesivos y los daños continuados. Los daños sucesivos son "una secuencia de reconocimientos de consecuencias lesivas por parte del perjudicado, pero que se van conociendo en momentos distintos entre los que media un lapso de tiempo finito, sin que en momento alguno sean previsibles los daños subsiguientes, ni sea posible descubrirlos empleando diligencia razonable." *Santiago v. Ríos Alonso*, 156 DPR 181, 191 (2002), *citando a* H. Brau del Toro, *Los daños y perjuicios*

---

[9] Dado que los hechos de este caso se suscitaron durante la vigencia del Código Civil de 1930, derogado por virtud del Código Civil de 2020, aplicará el antiguo estatuto.

_extracontractuales en Puerto Rico_, 2da ed., San Juan, Publicaciones JTS, V. II, 1986, pág. 643. Importante es que cada uno de los daños unitarios que constituyen en conjunto los daños sucesivos, constituyen una unidad jurídica de daño que permite que se origine la causa de acción resarcitoria. _Íd._ A saber, cada reconocimiento de una lesión por un acto torticero produce un daño distinto que genera una causa de acción independiente. _Íd._ El término prescriptivo para ejercer cada causa de acción por daños sucesivos comienza a decursar desde el momento en que se reconoce el daño particular. _Íd._

Por otro lado, los daños continuados se han definido como:

aquellos producidos por uno o más actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen también que también se conozca - por ser previsible - el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto compuesto por elementos de un daño actual (aquel que ya ha acaecido), y de daño futuro previsible y por tanto cierto. _Íd._, pág. 190.

Es decir, los daños y perjuicios causados por actos u omisiones continuos distinguidos por ser una unidad de daño generan "una sola causa de acción que comprende todos los daños ciertos, tanto los actuales como los previsibles en el futuro, como consecuencia de una conducta torticera continua". _Rivera Ruiz et al. v. Mun. de Ponce et al._, 196 DPR 410, 417 (2016). Ahora bien, lo esencial de los daños continuados no es la naturaleza de la lesión sufrida, sino el carácter continuo o progresivo del acto torticero que lo origina. _Íd._, pág. 418. Además, el daño no es previsible. _Rivera Prudencio v. Mun. de San Juan_, 170 DPR 149, 168 (2007). Por ello, el término prescriptivo para reclamar daños de naturaleza continua comienza a decursar desde que se verifican los últimos actos u omisiones o se produce el resultado definitivo, lo que sea posterior. _Rivera Ruiz et al. v. Mun. de Ponce et al., supra_, pág. 426. Esto, con el objetivo de evitar la radicación excesiva de litigios o enmienda a la demanda para incluir

alegaciones y reclamos por los daños sufridos por la misma causa posterior a la presentación de la demanda original. *Íd.*, pág. 428.

Nuestro Tribunal Supremo clasificó que la alegación de daños por incidentes repetidos de maltrato físico y emocional se trata de casos de daños continuados, ya que la persona perjudicada se mantiene en un círculo vicioso de maltrato. *Santiago v. Ríos Alonso,* *supra,* pág. 192. Pues, en los casos de violencia doméstica, la parte negligente o culposa no cesa hasta que la parte perjudicada rompa el ciclo de maltrato. *Cacho González et al. v. Santarrosa et al.*, 203 DPR 215, 226 (2019). En tal eventualidad, "[a] tenor con la doctrina de los daños continuados correspondientes a las acciones donde cada acto de violencia, tanto físico como emocional, forma parte de un patrón, ambiente o ciclo de maltrato e intimidación, el último incidente de maltrato, cuando la víctima rompe con el ciclo de maltrato y reconoce que ha sufrido un daño cierto, es el que activa la causa de acción y, en consecuencia, constituye el momento a partir del cual puede ejecutarse la misma". *Íd.*, pág. 195.

### F. Afectación del crédito

En otro extremo, el Tribunal Supremo resolvió que un acto negligente de proveer información negativa a las agencias de información de crédito, lo cual provoca afectarle el crédito a la persona perjudicada y la denegación de préstamos, provoca una acción de naturaleza extracontractual al amparo del Artículo 1802 del Código Civil, *supra*, sec. 5141. Véase *Torres Maldonado v. JC Penney Co.*, 130 DPR 546, 559 (1992).

### G. Doctrina de impedimento colateral por sentencia

Por último, la doctrina de cosa juzgada en su modalidad de impedimento colateral por sentencia es una defensa afirmativa que su mera alegación sin plantearse de forma clara, expresa y específica al responder a una alegación se tendrá por renunciada. R. Hernández Colón, *op. cit.*, pág. 290. En esencia, esta doctrina "impide que se

litigue en un litigio posterior un hecho esencial que fue adjudicado mediante sentencia final en un litigio anterior". *PR Wire Prod. v. C. Crespo & Asoc.,* 175 DPR 139, 152 (2008). El propósito de esta figura es que se promueva la economía procesal y judicial evitando que se litigue en más de una ocasión cuestiones ya adjudicadas en un pleito anterior. *Íd.,* págs. 152-153. La doctrina de impedimento colateral surte efectos cuando un hecho esencial para el pronunciamiento de una sentencia se dilucida y se determina mediante sentencia válida y final [y] tal determinación es concluyente en un segundo pleito entre las mismas partes, aunque estén envueltas causas de acción distintas". *Íd.,* pág. 152; *Presidential v. Trancaribe,* 186 DPR 263 (2012); *Beníquez et al. v. Vargas et al.,* 184 DPR 210, 225 (2012). Esta doctrina se manifiesta en dos (2) modalidades. La modalidad defensiva del impedimento colateral por sentencia permite que la parte demandada levante la defensa, al impedir la litigación de un asunto levantado y perdido por la parte demandante en un pleito anterior frente a otra parte. *Íd.,* pág. 153. Por otro lado, la modalidad ofensiva permite que la parte demandante en un litigio posterior impida que la parte demandada relitigue cuestiones ya dilucidadas y perdidas frente a otra parte. Por ello, "**no procede la interposición de la doctrina de impedimento colateral por sentencia -ya sea en su vertiente ofensiva o defensiva- cuando la parte contra la cual se interpone (1) no ha tenido la oportunidad de litigar previamente el asunto y (2) no ha resultado ser la parte perdidosa en un litigio anterior**". *Íd.* (Énfasis nuestro).

A la luz de la normativa jurídica esbozada, procedemos a aplicarla a la controversia ante nuestra consideración.

**III.**

En el presente caso, el señor Albors Lahongrais le adjudicó al TPI la comisión de cuatro (4) señalamientos de error. Como primer error, el apelante planteó que el TPI incidió al establecer que la

reconvención de la señora Riera Carrión era compulsoria, siendo una permisible y que erró al determinar que la prueba enmendó las alegaciones. El apelante arguyó que la reconvención presentada por la señora Riera Carrión no era compulsoria, puesto que no existía vinculación entre las causas de acción de enajenación parental y persecución maliciosa con la causa de acción por afectación del crédito personal de la apelada. Sobre lo anterior, la señora Riera Carrión nos argumentó que mediante *Resolución* del 1 de diciembre de 2021, la cual advino final, firme e inapelable, el TPI resolvió que su reconvención era compulsoria. La apelada sostuvo que el señor Albors Lahongrais no acudió ante este Foro para revisar tal determinación interlocutoria. A su vez, sostuvo que el maltrato emocional y económico por parte del apelante constituyó un daño continuado, por el cual se permitió desfilar prueba sobre los daños y perjuicios por las angustias mentales, los daños morales y el daño a su crédito. Asimismo, nos planteó que correspondía que el señor Albors Lahongrais demostrarnos que la valoración de la prueba testifical fue producto de prejuicio, parcialidad, pasión o error manifiesto. Al entender que el apelante no lo demostró, nos invitó a sostener que su causa de acción en la *Reconvención* no estaba prescrita. Por otro lado, manifestó que el apelante no objetó oportunamente que la prueba presentada por los daños del impago de la hipoteca enmendara las alegaciones de la reconvención.

Es preciso destacar que mediante una *Resolución* emitida el 1 de diciembre de 2021, la cual advino final, firme e inapelable, el TPI resolvió que la *Reconvención* presentada por la señora Riera Carrión era compulsoria. Dicha determinación del Foro Primario constituyó la ley del caso, por ello a la luz de la referida doctrina no es meritorio discutir el señalamiento del señor Albors Lahongrais en cuanto a que el TPI erró al no establecer que era una reconvención permisible.

Expuesto lo anterior, nos atañe analizar el señalamiento del apelante en cuanto a que el TPI incidió al determinar que la prueba presentada enmendó las alegaciones de la apelada para probar daños morales, angustias mentales y daños por la afectación de su crédito por el impago de la hipoteca de la residencia que ambas partes son titulares. Tras un estudio sosegado del expediente, incluyendo la transcripción de la prueba oral, concluimos que no le asiste la razón al apelante. Sabido es que la Regla 13.2 de Procedimiento Civil, *supra*, R. 13.2, permite que las alegaciones se enmienden para conformarlas a la prueba, cuando mediante el consentimiento expreso o implícito, las partes someten a juicio cuestiones no suscitadas en las alegaciones. Subrayamos que si la parte contraria no objeta la prueba, las cuestiones no suscitadas en las alegaciones se someten al tribunal con el consentimiento implícito de las partes. Es menester resaltar que en la transcripción de la prueba oral de este caso surgió que tanto la señora Riera Carrión como el señor Albors Lahongrais prestaron testimonio en torno al impago de la hipoteca y las dos (2) demandas en cobro de dinero y ejecución hipotecaria, más la apelada declaró sobre los daños que dicha acción le provocó. Esto, sin que el apelante objetara el testimonio de la apelada, es decir, otorgó su consentimiento para enmendar las alegaciones de la señora Riera Carrión. Por ello, no erró el TPI al determinar que la prueba enmendó las alegaciones de la apelada al alegar daños por la ejecución hipotecaria y por la afectación de su crédito.

Como tercer error, el señor Albors Lahongrais esbozó que, ya que el pago de la hipoteca figuraba como parte de la pensión alimentaria de sus hijos, incidió el TPI al compensar económicamente a la señora Riera Carrión cuando esta debía solicitar desacato en la Sala de Relaciones de Familias en el caso que continúa vigente y se autoinfligió el daño por sus propios actos. Esto último, dado que se negó a firmar los documentos en el procedimiento de mitigación de

pérdida para reestructurar los pagos hipotecarios, previo a instarse el caso de cobro de dinero. Cónsono con lo anterior, como cuarto error, el apelante expresó que el TPI erró al conceder una compensación porque se afectó el crédito de la apelada cuando la prueba desfilada fue insuficiente para demostrar que la afectación del crédito se debió al impago de la hipoteca.

Sobre el tercer error, no tiene razón el apelante al entender que el reclamo en daños por el impago de la hipoteca correspondía litigarse en la Sala de Relaciones de Familia. Nos parece esencial distinguir que en este caso no se reclamó en sí el pago de la hipoteca, por lo que es inmeritorio discutir si dicho reclamo le compete resolverlo a la Sala de Relaciones de Familia. Por el contrario, en este caso, la apelada alegó daños y perjuicios a raíz de la acción del señor Albors Lahongrais en no pagar la hipoteca del apartamento donde ella residía con sus hijos. Por tanto, no erró el TPI al considerar y resolver las alegaciones en daños y perjuicios de la señora Riera Carrión.

Concerniente al cuarto error, con respecto a la alegación de la afectación del crédito de la señora Riera Carrión por el señor Albors Lahongrais dejar de pagar las mensualidades hipotecarias, no erró el TPI al conceder dichas partidas por daños. Primero, en nuestra función revisora, debemos brindarle deferencia a la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos formuladas por el TPI, en ausencia de error manifiesto, prejuicio, parcialidad o pasión. Así que, luego de analizar exhaustivamente el expediente, concluimos que no erró el TPI al apreciar la prueba y conceder los daños a raíz del impago de la hipoteca. Nótese que el señor Albors Lahongrais no nos argumentó instancia alguna de error manifiesto, prejuicio, parcialidad o pasión por parte del Foro Primario. Es decir, el apelante no nos demostró que el TPI actuó mediante inclinaciones personales que lo indujeron a adoptar posiciones, preferencias o rechazos con respecto a las partes

o sus causas. Además, las conclusiones del TPI no demostraron estar en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. Por ello, no se justifica nuestra intervención con el criterio del Foro Primario. No empecé lo anterior, no albergamos duda de que existe base suficiente para confirmar la determinación del TPI. Veamos.

De las determinaciones de hechos formuladas por el Foro Primario y de los testimonios vertidos, los cuales tuvimos la oportunidad de evaluar mediante la transcripción de la prueba oral, surgió que, por estipulación realizada en el año 2010 en un caso en la Sala de Relaciones de Familia, se acordó que apelante era la persona responsable de realizar los pagos correspondientes a la hipoteca. De la transcripción de la prueba oral emanó que el propio señor Albors Lahongrais estableció que desde el año 2017 no pagaba la hipoteca y reconoció que se adeuda una cantidad sustancial de dinero, por lo que la entidad bancaria instó una segunda demanda en cobro de dinero y ejecución hipotecaria, dado que la primera fue desistida al satisfacerse los pagos atrasados hasta diciembre del año 2015.[10] De los testimonios vertidos, no se expuso razón alguna que justificara el impago de la hipoteca. Dicha versión de los hechos fue confirmada por la señora Riera Carrión, quien estableció que desde el año 2017, el señor Albors Lahongrais no sufraga la referida hipoteca, adeudando $500,000.00 al momento de incoarse la demanda, por lo que el apartamento donde residía se encontraba en un proceso de ejecución hipotecaria.[11] Si el apelante no hubiese dejado de pagar las mensualidades hipotecarias, la residencia no estuviese en procedimiento de ejecución hipotecaria y el crédito de la apelada no

---

[10] Véase TPO del 7 de noviembre de 2022, pág. 876, líneas 6-25; pág. 877, líneas 1-25; pág. 878, líneas 1-5; TPO del 2 de diciembre de 2022, pág. 996, líneas 115-25; pág. 997, líneas 1-5; TPO del 10 de enero de 2023, pág. 1378, líneas 9-13, pág. 1382, líneas 15-22; pág. 1383, líneas 17-24.
[11] Véase TPO del 7 de octubre de 2022, pág. 326, líneas 10-21; pág. 331, líneas 17-25; pág. 332, líneas 1-10.

se hubiese afectado. Cabe señalar que el señor Albors Lahongrais no presentó prueba que refute el testimonio de la señora Riera Carrión, el cual el TPI le impartió credibilidad, sobre que la afectación de su crédito se debió a la ejecución hipotecaria de la residencia de la cual ambos son titulares. Como parte de los daños que le provocó dicha acción judicial en cobro de dinero, la apelada declaró lo siguiente:

> Es humillante porque uno sabe que otras personas saben que el apartamento es considerado un *distress*, que ese apartamento está para ejecución, o sea, el bochorno de uno tener el crédito dañado. O sea, a mí no me aprueban ni siquiera… no me han aprobado crédito ni siquiera para sacar una cuenta en *Marshalls*, ni en *TJ Max*, para comprar unas gomas en *Sears*, que consistentemente tengo que ir a pedirle a mi papá y a mi mamá, que si yo fuera hija única pues me imagino que no había problemas, pero nosotros somos cuatro hijos. O sea, la hija que consistentemente por favor, sáquenme de este apuro. Ahora mismo tengo que pagar un… unos asuntos que tienen que ver con el caso de división, "mami, necesito que me ayudes a pagar esto para yo recibir la prueba, que es para mi defensa." Porque nadie me aprueba mi crédito, yo no he podido sacar un préstamo ni… bueno, nada, cero, destrozado mi crédito, destrozado mi crédito.

Es decir, conforme con el testimonio creído de la señora Riera Carrión, la acción del señor Albors Lahongrais en dejar de pagar la hipoteca del apartamento del cual la apelada es codueña, le provocó humillación por el hecho de que otras personas conocieran que su residencia estaba en proceso de ejecución hipotecaria, más causó que se le dañara su crédito y consecutivamente que no le aprobaron préstamos, por lo que consistentemente tenía que recurrir a la asistencia económica de sus progenitores. Así las cosas, se proveyó suficiente prueba circunstancial para coincidir con el TPI en que los daños morales, las angustias mentales y el daño al crédito de la apelada fue una reclamación legítima de la apelada, que no estaba prescrita y que fue causada por el acto del apelante de dejar de pagar la hipoteca de la residencia. Tampoco incidió el Foro Primario al ordenar que el señor Albors Lahongrais debía compensar a la señora Riera Carrión por las sumas de $25,000.00 por los daños morales y

las angustias mentales y $5,000.00 por el daño a su crédito, cuantías que no fueron planteadas como error en este recurso.

Por último, como segundo error, el señor Albors Lahongrais señaló que el Foro Primario incidió al formular determinaciones de hechos en la *Sentencia,* cuando determinó que las causas de acciones estaban prescritas. Sobre el particular, alegó que la doctrina de impedimento colateral por sentencia impedía que el TPI formulara determinaciones de hechos objeto de otros casos entre las partes y sobre elementos de causas de acciones prescritas. Al respecto, la señora Riera Carrión expuso que la doctrina del impedimento colateral por sentencia era inaplicable, puesto que el apelante la renunció al no alegarla como defensa afirmativa. Al evaluar el expediente del presente caso, surge indubitablemente que no tiene razón el apelante al establecer que la doctrina de impedimento colateral por sentencia impedía que el TPI formulara determinaciones de hechos. El hecho de que el TPI haya tomado conocimiento judicial de otros casos como parte de los eventos ocurridos entre las partes del presente pleito no es indicativo de que el Foro Primario haya adjudicado controversias que se hayan atendido en otros pleitos entre el señor Albors Lahongrais y la señora Riera Carrión.

## IV.

Por los fundamentos que anteceden, se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones